Filed 8/31/15

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DANIEL FIAMATAI FOALIMA,<br><br>    Defendant and Appellant. | C071581<br><br>(Super. Ct. No. 10F08038) |

APPEAL from a judgment of the Superior Court of Sacramento County, Ernest W. Sawtelle, Judge. Affirmed.

Madeline McDowell, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Caely E. Fallini, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II, III, V, & VI.

1

Defendant Daniel Fiamatai Foalima appeals from his conviction of first degree murder. He contends the trial court erred by: (1) refusing to strike a possible accomplice's testimony after the accomplice testified he did not know the answer to most of the questions asked him; (2) instructing the jury on accomplice testimony; (3) admitting evidence of media coverage of the murder to impeach a witness's testimony that was recorded in an earlier trial but admitted here; (4) ordering direct victim restitution allegedly for a crime of which defendant was acquitted and that was not the proximate cause of the victim's damage; (5) imposing jail booking and classification fines without determining defendant's ability to pay; and (6) imposing restitution fines without determining the defendant's ability to pay.

We affirm the judgment in its entirety.

FACTS

The prosecution charged defendant with murder (Pen. Code, § 187, subd. (a)),[1] second degree robbery (§ 211), and arson (§ 451, subd. (b)). The information alleged defendant used a dangerous weapon (a knife) to commit the murder and the robbery (§ 12022, subd. (b)(1)), and he committed the murder while committing the robbery (§ 190.2, subd. (a)(17)).

The parties presented the following evidence at trial:

*People's case-in-chief*

*The events of August 6-7, 2010*

Shalini Singh, the victim's daughter, lived at the North Avenue Apartments in Sacramento with her daughter, a roommate, and the roommate's children. The victim, Arun Singh (Singh), was 50 years old. He often visited Shalini and frequently stayed the night at her apartment. Singh had been involved with drugs for the last 20 years.

---

[1] Undesignated references to sections are to the Penal Code.

2

At approximately 10:00 p.m. on Friday, August 6, 2010, Shalini was in the apartment complex's hot tub with friends. While Shalini and her friends were in the hot tub, defendant walked into the pool area and asked for a cigarette. Shalini and defendant conversed, and she pointed out the location of her apartment.

Singh came to the pool area, and Shalini and he returned to her apartment. Singh asked if he could stay the night. Shalini said yes, but she and her roommate would be gone for the night. Singh left between 11:00 and 11:30 p.m. to get some food. Shalini would not see him again alive.

Meanwhile, at approximately 10:15 p.m. on August 6, 2010, after he had spoken with Shalini, defendant met Cindy Pau at the North Avenue Apartments. Pau had earlier contacted defendant to buy ecstasy pills, and they negotiated the sale in her car at the apartment complex. Defendant told Pau he would return with the drugs. Pau waited and sent at least one text message to defendant. At 10:26 p.m., defendant sent a text message to her saying he could not get the drugs. The apartment complex's surveillance video filmed Pau leave the complex at approximately 10:28 p.m.

The surveillance video filmed defendant and two others leaving the complex on foot at 11:01 p.m. August 6, 2010, and returning at about 11:52 p.m. Defendant was wearing a long white t-shirt. The video also filmed defendant and two others from 1:23 a.m. until 1:25 a.m. hanging out in the complex's parking lot. In this later segment, defendant was wearing a dark hooded sweatshirt and white tennis shoes.

Sometime after 2:00 a.m. on August 7, 2010, Shalini received a telephone call from her upstairs neighbor. She learned her apartment was on fire and her father was dead. Her father's wallet and car keys were never found.

Shalini's upstairs neighbor, Dion Brent, testified the complex's fire alarm sounded sometime after 2:00 a.m. Brent and his son entered Shalini's apartment and saw a fire in the living room. They attempted to put it out with a fire extinguisher. Others arrived and

3

doused the fire with a water hose. Brent saw a body in the apartment's living room. To him, the body appeared not to have legs or arms. The fire department arrived at 2:50 a.m.

Quentin Watts and Lazarus Bolton shared an apartment at the North Avenue Apartments. In the early morning hours of August 7, 2010, Watts returned home with his friend Leonard Gray and some female friends. He noticed emergency vehicles in the area. After he and his group went inside his apartment, a few others came in. In a later interview with police, Watts told the detective one of the persons who had come in had something on his hands that Watts believed was blood, and he didn't want that person reaching into the chips. In the same interview, Watts viewed a photo lineup and identified defendant as the person who had blood on him. He also identified Laki Lee Lopa and Fine Tupuo as two others that were with defendant. At trial, Watts could not remember making these identifications.

Bolton, in a later interview with detectives, also identified defendant, Lopa, and Tupuo as people who were inside his apartment or right outside his door the night of the murder. Police investigators later determined defendant, Tupuo, and Lopa knew each other. Tupuo lived at the North Avenue Apartments, and Lopa lived one block away.

Watts left his apartment about 45 minutes after he had arrived. As he left, he saw a fire on a stairwell or landing area near his apartment that was smoldering. He walked past the fire and left.

*Investigations*

Fire investigators viewed the apartment. The apartment's front door had no obvious signs of damage. The victim's body was discovered in the living room. Investigators observed water from the overhead sprinkler system on the floor, the victim, and the furniture. They saw charring on the carpet, the victim, and some cushions. The apartment appeared ransacked. Fires had also been started in two bedrooms. Two smoke detectors were missing. The investigator determined the fires were deliberately set with an open flame device and were incendiary in nature.

4

Investigators also determined another fire had been deliberately set with an open flame device on the landing of an exterior stairwell of another apartment building at the North Avenue Apartments during the early morning hours of August 7, 2010. Investigators collected charred, fabric remains of what appeared to have been a black jacket.

Investigators found a broken knife blade underneath the victim's body. The knife contained the victim's DNA, but no unknown profiles were found in the recovered DNA. Fingerprints found in the apartment belonged to the victim or the apartment's residents. Heat, smoke, and fire can affect the recovery of fingerprints and DNA.

On August 9, 2010, fire investigators found two smoke detectors in a field adjacent to the apartment complex. The victim's DNA was recovered from one of the smoke detectors.

The forensic pathologist determined the victim died from blunt force head injuries, multiple stab wounds, and asphyxia by neck compression. The victim's upper teeth, nose, face bones, skull and larynx were fractured. His face "was basically caved in." He had numerous bruises and lacerations on his face, head, and neck. Some of the bruises were "pattern" bruises, or a bruise caused by an object's impact, with the object's impression marking the skin. There were three distinctive patterns on the victim's head. Some marks looked like the tread of a shoe. Elongated parallel marks went across the right eyebrow. A patterned mark consisting of "concentricular" marks like a target in three pairs existed on the scalp.

The victim was stabbed approximately 20 times in the back, neck, head, shoulder, arm, jaw, and torso. Blunt force injuries and the stab wounds were inflicted contemporaneously. The victim's left hand had been cut off after he had died. His right hand had cuts and hacks in what looked like an attempt to cut it off after he had died. The fingernails were clipped short and did not extend to the fingertips. The victim's body had also been set on fire after he had died.

*Natalie Jackson's tip*

In August of 2010, defendant and Natalie Jackson were "friends with benefits," and had contact with each other once a week.[2] On the morning of August 16, 2010, Jackson e-mailed law enforcement about the North Avenue Apartments murder. In her e-mail, Jackson stated she had overheard "a guy that I know very well" talking about the murder. She said there should be a bag with a hand and a knife in it by the freeway and the apartment complex's surrounding area, and she asked the police to search for it. She also asked the police to check the victim's fingernails for DNA, because he had scratched the suspect a few times. She wanted the police to find this evidence before she gave them the suspect's name. If they took him in for questioning before then, he would know she had something to do with it and her life would be in danger.

The police asked Jackson for more details. She wrote that she knew there was a hand and a knife in a bag "near the [I]-80 freeway behind the apartments some where around the field." (*Sic.*) She also stated she believed the victim still had a hand attached to him, and asked police to check his fingernails for DNA from the suspect. She again would not release the suspect's name.

Later that day, a detective spoke with Jackson by phone. Jackson repeated the information she had given the police earlier. She also informed the detective that defendant was the perpetrator. She had been at a party and overhead defendant and others talking about the crime. She stated the victim had a history of selling drugs, and defendant intended to rob him for ecstasy pills and maybe some marijuana. Jackson spoke about the fire in the stairwell landing, and said defendant had taken off what he was wearing and had burned it. She also said defendant had cut off the victim's hand

---

[2] Defendant underwent an earlier trial, but the court declared a mistrial because the jury was deadlocked. Jackson testified at defendant's first trial, but she was unavailable to testify at the second trial. Her testimony from the first trial was read into the record.

because there had been an altercation and the victim had scratched him. Defendant had not been sure which hand the victim used to scratch him.

On August 22, 2010, police found a human left hand in some bushes on the south side of Interstate 80 and just northeast of the North Avenue Apartments. The parties stipulated the hand belonged to the victim. Police also found two knives and a pair of rolled up gloves in the same vicinity. The victim's DNA was recovered from both knives.

Defendant was arrested on August 25, 2010, for violating parole.

On August 30, 2010, Jackson attempted to recant her earlier information. She e-mailed the police stating she had given them wrong information on the suspect: "I thought I had the person but really was all rumors and I just over heard it. I hope I don't get in trouble for this, I was only trying to do the right thing and I'm sorry."

At trial, Jackson testified she originally e-mailed police because she wanted a reward. She did not know at the time if there was a reward and did not ask for one in the e-mails. She stated she had lied in her earlier e-mails. She had not overheard anything and had knowingly falsely accused defendant. She also was not afraid of defendant. She nonetheless expected to get a reward if the police found the perpetrator. She claimed she had called about a reward, but she did not remember with whom she spoke.

Jackson claimed the information she received about the murder came from rumors. She said rumors about the murder were "everywhere" on MySpace, the news, and the Internet. She could not name any person from whom she heard the rumors.

Jackson also testified she sent the e-mails to police because she did not like defendant at the time. She was upset that he had "cheated" on her and impregnated a woman named Laura Tautala. Defendant had also impregnated Jackson during the summer of 2010 and had urged her to abort the baby, but did not make the same request of Tautala. That upset Jackson. She accused defendant of committing the murder so she

7

could "get him back" from Tautala. She also believed defendant would think it funny she had named him as a suspect in the murder.

Jackson denied she and defendant had a romance after he was placed in custody. She thought they had talked between five and 10 times from August through September 2010. In fact, defendant called her 71 times from August 28 through September 22, 2010.

*Additional investigation*

After defendant's arrest, law enforcement officers located a pair of shoes in the trunk of a car belonging to defendant's girlfriend Laura Tautala. The shoes were the white and blue shoes defendant wore the night of the murder. One shoe tested positive for blood on the side of its sole. Tiny blood stains were in the crevices of the left shoe's sole, which matched defendant's DNA. Other stains on the shoe tested negative for blood, but the results could have been affected if defendant washed the shoes.

A criminalist testified the pattern on the soles of the shoes defendant wore the night of the murder was similar to a patterned bruise on the victim's head. He concluded the shoes could have made the pattern bruise and could not be eliminated as the bruise's source.

Defendant's cell phone records placed him at the North Avenue Apartments on the night of August 6, 2010, and the early morning of August 7, 2010. The records also placed him at his parent's house on the afternoon of August 8, 2010.

An analysis of a laptop computer taken from defendant's parents' house revealed that during the afternoon of August 8, 2010, someone used the laptop to search the Internet for "homicide on North Avenue, Del Paso Heights," and "homicide on North Avenue Apartments."

*Interviews with defendant*

A detective interviewed defendant after he was arrested on August 25, 2010, for a parole violation to ask him questions about the murder. The detective observed defendant had scratches on his upper torso near his left shoulder and on his stomach. The scratches were healing and did not appear to be fresh. Defendant initially claimed the scratches were from riding a scooter, but he later said he did not know how he got them. Defendant also mentioned he had been in a fistfight within the last month. Defendant said he was alone in his apartment at the time of the murder and was asleep from 11:00 p.m., August 6, 2010, until about 8:00 or 9:00 a.m. the next morning. He had lost his cell phone and could not account for the phone calls and text messages on his phone the night of August 6, 2010. Defendant said he did not know where the North Avenue Apartments were and had never been there. He said he did not learn anything about the murder from the news and did not know anything specific about it. He also denied ever researching the murder on a computer.

The same detective interviewed defendant again on October 29, 2010. The detective informed defendant he had additional evidence that defendant had been at the North Avenue Apartments the night of the murder and that he regularly visited the complex. Defendant said he did not know anything, had nothing to say or explain, and had nothing to do with the matter.

*Media coverage*

Prior to the second trial in 2012, an analyst from the District Attorney's office researched what information was publically available on the Internet between August 7, 2010, and August 16, 2010, that discussed the murder. He viewed Web sites such as MySpace, Facebook, the Sacramento Bee, YouTube, and Google. The media coverage reported the victim had been mutilated, dismembered, had his legs and arms cut off, or had his hands and feet cut off. Police later reported the dismemberment had not been as extensive as witnesses had reported, but they did not say what dismemberment had

occurred. The analyst found no public "personal chatter" about the murder between individuals on social media sites. He could not search private conversations or posts.

*Defense*

Defendant testified at trial. He served a prison term for shooting into an inhabited dwelling. He was released on parole on July 6, 2010, 31 days prior to Singh's murder. He started selling drugs within a couple of days after his release. He also drank alcohol often and openly in violation of his parole conditions.

Defendant was friends with Laki Lee Lopa and Fine Tupuo.[3] Tupuo lived at the North Avenue Apartments. On the evening of August 6, 2010, defendant was hanging out and drinking malt liquor at the North Avenue Apartments with Tupuo and others. He spoke with Shalini Singh at the hot tub and asked her for a cigarette. She gave him one.

That same night, he agreed to sell Cindy Pau some ecstasy. She met him at the apartment complex, and they negotiated the drug sale in her car. After he got out of Pau's car, he met with "AB" and another person about a block away from the apartments to purchase the drugs. He got into a "scuffle" with AB's companion, and ended up with a bloody nose. He cleaned himself back at Tupuo's apartment, including his shoes, which had blood on them.

He then ran into Quentin Watts and "some girls." He and Tupuo went to Watts's apartment and hung out with the girls. He did not have blood on his hands while he was there. When he left the apartment, he saw a fire on a landing and walked around it. He also saw police officers and firemen at the other side of the complex. He went to Lopa's house and spent the night there by himself.

---

**3**    Lopa was deceased by the time of trial.

Defendant denied killing or injuring the victim. He denied saying there were knives and a hand in the field. He denied telling Jackson he took part in a murder. He admitted looking on the Internet for information about the murder.

Defendant admitted lying to law enforcement about never having been to the North Avenue Apartments, his whereabouts on the night of the murder, his residence, whether he researched the murder, and where his cell phone was.

He agreed he and Jackson were "friends with benefits." While he was in custody in and around 2009 and 2010, they corresponded and she put money in his prison account. After he was released from custody in 2010, he impregnated Tautala and Jackson. He encouraged Jackson to get an abortion, but she did not take that well. After returning to custody in August 2010, he contacted Jackson more than 70 times through September. He wanted her to "be there" while he was incarcerated, and he wanted her to believe they had a future together.

*Rebuttal*

The prosecution called Fine Tupuo as a witness on rebuttal and granted him use immunity.[4] Tupuo said he did not know the answers to many of the questions asked him. He did state he did not know defendant and had never met him. Tupuo had lived at the North Avenue Apartments in August 2010. He did not know that while he lived at the North Avenue Apartments that a person had been murdered there.

*Judgment*

The jury convicted defendant of first degree murder, but acquitted him of second degree robbery and arson. The jury also found not true the enhancement allegations alleged against the murder count.

---

[4]     Use immunity prevents law enforcement officers from using the witness's testimony, or its fruit, in a subsequent prosecution of the witness. (*People v. Defreitas* (1983) 140 Cal.App.3d 835, 837; § 1324.)

11

The trial court sentenced defendant to a prison term of 25 years to life. It imposed direct victim restitution in the amount of $13,700, which included $4,500 for Shalini's damaged clothing and household goods. The court also imposed a $10,000 restitution fine under section 1202.4, subdivision (b), and stayed a parole revocation restitution fine of $10,000 under section 1202.45.

DISCUSSION

I

*Fine Tupuo's Testimony*

Defendant contends the trial court violated his Sixth Amendment right to confrontation when it refused to strike Fine Tupuo's testimony and permitted the prosecution to make inferences from the testimony during closing argument. We disagree, as defendant was given an opportunity to cross-examine Tupuo, which is what the Constitution requires when a witness incurs a loss of memory. That counsel chose not to take advantage of the opportunity is not court error.

A. *Background information*

Witnesses, including defendant, testified Tupuo was with defendant during the night of the murder. The prosecution called Tupuo to testify in rebuttal. The prosecution gave him use immunity for his testimony. On direct examination, Tupuo answered, "I don't know" or "I don't remember" to most of the prosecutor's questions. For example, when asked if he was currently serving prison time for a first degree burglary conviction, Tupuo said he did not know about it.

Tupuo stated he did not know if he knew defendant and did not know him by his name. He had never met defendant. He acknowledged he had lived in the North Avenue Apartments in August 2010, but when asked if defendant had ever visited him there, he said, "I don't know." The prosecutor informed Tupuo that defendant had said he visited him at least twice a week, and he asked Tupuo if that refreshed his recollection of

12

whether defendant had visited him. Tupuo said, "Probably did. Probably not. I don't know."

Tupuo said he did not know if there had been a fire in one of the apartments or if someone had been murdered there. When asked if he recalled fire engines coming to the apartment complex on Saturday, August 7, 2010, he answered, "I don't know."

When asked if the prosecutor's investigator and the defendant's investigator had interviewed him within the last week or so, Tupuo said, "Probably." However, he did not remember telling the investigators he had been at Lopa's house, heard the sirens, or saw the fire engines go by on the way to the apartment complex.

When asked if defendant obtained a dark sweater or jacket with a hood from Tupuo's apartment, Tupuo answered, "Probably did. Probably. No, I don't know." He did not remember owning a dark sweat jacket with a hood. He did not know if he walked with defendant to AM/PM to buy more beer. He did not want his statement to the defense investigator read back to him to refresh his memory.

Tupuo did not remember telling the defense investigator he was not with defendant the night of August 6 and morning of August 7, 2010. He did not remember telling the defense investigator that he was at Lopa's place sleeping by himself through the early morning hours of August 7.

Tupuo could not remember telling the prosecution's investigator that he left the North Avenue Apartments in the early morning hours of August 7 and left defendant behind. He also could not remember telling the defense investigator that he was at the hot tub area drinking beers earlier on the evening of August 6, 2010.

Tupuo could not remember moving out of the North Avenue Apartments, but he said he moved into a "house with [] wood" on a street named Ethan by the Arden area. Asked if he was with defendant the night of the murder, Tupuo said he did not remember. He also did not know if defendant had been in his apartment the night of August 6 at different times.

13

Defense counsel's entire cross-examination of Tupuo went as follows:

"Q     If I ask you any questions are you going to know anything?

"A     No.

"[Defense counsel]:  No further questions."

Defendant moved to strike Tupuo's testimony.  He claimed he was denied his right to cross-examine Tupuo because Tupuo said he would not know anything if he was asked a question and was therefore unavailable to be cross-examined.  Defendant asked the court to admonish the jury not to consider Tupuo's testimony.  He also asked the court to prohibit the prosecutor from arguing any inferences from Tupuo's testimony in his closing argument.

The trial court denied the motion.  The court acknowledged Tupuo was not a cooperative witness.  However, Tupuo answered some of the questions put to him.  Moreover, defense counsel did not "actually make any attempt" to ask Tupuo questions.  The court could not find Tupuo would have refused to answer any of defense counsel's questions because counsel did not in fact ask him any other than the one question which all but required a simple, predictable answer.

The trial court also refused to prohibit the prosecution from arguing inferences from Tupuo's testimony.  Based on the evidence that defendant and Tupuo were together the night of the murder at the apartment complex, the prosecution could infer Tupuo was an accomplice and that he refused to give helpful answers in order to protect his friend or not to incriminate himself, even though he had immunity.  Those were reasonable arguments the prosecution could make to the jury regarding Tupuo's motivation for testifying as he did.

During closing argument, the prosecutor asserted defendant believed he was "untouchable," in part because residents of the apartment complex, including Tupuo, would not testify against him.  Even when given immunity, Tupuo would not confirm defendant's story that the two of them were together the night of the murder drinking

14

beer, and that defendant had a fight and cleaned himself up at Tupuo's apartment. Instead, Tupuo denied even knowing defendant.

The prosecutor continued: "[Y]ou might think well, that was kind of worthless. I didn't get much out of him. [¶] But actually, you got a lot out of Mr. Tupuo because it makes you think what's going on? Because Mr. Tupuo, what's up with a guy that is given a free pass, immunity, and asked questions about that night that says he can't remember anything and won't even acknowledge that [defendant], who visits him twice a week and was staying at his place, is his friend? [¶] Because he doesn't want to be a snitch. Doesn't want to be involved. The three of them are together all night. We've got one of 'em right here. [¶] We've brought the other one in front of you. He doesn't even want to be with him. That should let you know everything you need to know about [defendant]."

B.    *Analysis*

Defendant contends the trial court erred by refusing to strike Tupuo's testimony and by allowing the prosecution to argue inferences from his testimony. He asserts questioning an obdurate person who does not remember anything substantive is equivalent to questioning a witness who refuses to testify at all and thus violates his right to confrontation. We disagree.

We review the trial court's denial of defendant's motion to strike for an abuse of discretion. (*People v. Price* (1991) 1 Cal.4th 324, 422.)

The Sixth Amendment right of confrontation secures a defendant's right of cross-examination. (*Douglas v. Alabama* (1965) 380 U.S. 415, 418 [13 L.Ed.2d 934, 937].) The right of confrontation "has long been read as securing an adequate opportunity to cross-examine adverse witnesses." (*United States v. Owens* (1988) 484 U.S. 554, 557 [98 L.Ed.2d 951, 958] (*Owens*).) " '[T]he Confrontation Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in

15

whatever way, and to whatever extent, the defense might wish." ' [Citations.]" (*Owens, supra*, 484 U.S. at p. 559, original italics.)

That opportunity may be denied if a witness refuses to answer questions, but it is not denied if a witness cannot remember. A witness who "refuses to answer any question on direct or cross-examination denies a defendant the right to confrontation which contemplates a meaningful opportunity to cross-examine the witness. [Citations.]" (*People v. Rios* (1985) 163 Cal.App.3d 852, 864, fn. omitted; *People v. Murillo* (2014) 231 Cal.App.4th 448, 455-456 (*Murillo*) [witness's refusal on cross-examination to answer over 100 leading questions while the prosecutor read the witness's prior statement to police denied defendant his right of confrontation].)

By contrast, a witness who suffers from memory loss – real or feigned – is considered "subject to cross-examination" because his presence and responses provide the "jury with the opportunity to see [his] demeanor and assess [his] credibility." (*People v. Gunder* (2007) 151 Cal.App.4th 412, 420, (*Gunder* ) ["The circumstance of feigned memory loss is not parallel to an entire refusal to testify"]; *Owens, supra,* 484 U.S. at p. 559 [opportunity to cross-examine not denied where witness suffers from memory loss].)

*Owens* addressed the scope of the right of cross-examination granted to defendants. In that case, the assault victim, who suffered memory loss from the assault, testified he remembered identifying defendant as his assailant in an interview with an FBI agent. On cross-examination, the victim stated he could not remember seeing his assailant at the time of the assault and could not remember a number of persons who visited him in the hospital, although there was evidence he had received numerous visitors. Defense counsel was unable to refresh the victim's recollection. (*Owens, supra,* 484 U.S. at p. 556.) Defendant claimed on appeal he was denied the right to an effective cross-examination.

The United States Supreme Court found no constitutional violation, ruling memory testing was not essential to an opportunity for effective cross-examination. The

16

high court wrote the constitutionally guaranteed opportunity to cross-examine witnesses "is not denied when a witness testifies as to his current belief but is unable to recollect the reason for that belief. It is sufficient that the defendant has the opportunity to bring out such matters as the witness' bias, his lack of care and attentiveness, his poor eyesight, and even (what is often a prime objective of cross-examination, [citation]) the very fact that he has a bad memory. [The] ability to inquire into these matters suffices to establish the constitutionally requisite opportunity for cross-examination when a . . . witness' past belief is introduced and he is unable to recollect the reason for that past belief. . . . The weapons available to impugn the witness' statement when memory loss is asserted will of course not always achieve success, but successful cross-examination is not the constitutional guarantee." (*Owens, supra,* 484 U.S. at pp. 559-560.)

This court followed *Owens* in *Gunder*. There, a prosecution witness, a long-time friend of the murder defendant, testified he could not remember events on the night before the murders. The prosecution then played for the jury a video of the witness's earlier statement to police describing the events he claimed to have forgotten. On appeal, the defendant argued his trial counsel rendered ineffective assistance when he did not assert a violation of defendant's confrontation right. (*Gunder, supra*, 151 Cal.App.4th at pp. 417-418.)

We concluded defendant was not denied his confrontation right. We rejected the defendant's reliance on cases in which a witness's refusal to testify violated a defendant's right of confrontation. (*Gunder, supra,* 151 Cal.App.4th at p. 419.) Relying on *Owen*, we stated: "The circumstance of feigned memory loss is not parallel to an entire refusal to testify. The witness feigning memory loss is in fact subject to cross-examination, providing a jury with the opportunity to see the demeanor and assess the credibility of the witness, which in turn gives it a basis for judging the prior hearsay statement's credibility." (*Id.* at p. 420.)

17

*Owens*'s and *Gunder*'s reasoning applies here. Tupuo's asserted inability to recall or remember most of the events about which he was questioned did not by itself deny defendant an opportunity to cross-examine him. The jury had the opportunity to see Tupuo's demeanor and assess his credibility. Tupuo's " 'presence at trial as a testifying witness gave the jury the opportunity to assess [his] demeanor and whether any credibility should be given to [his] testimony or [his] prior statements. This was all the constitutional right to confrontation required.' [Citation.]" (*People v. Homick* (2012) 55 Cal.4th 816, 861, quoting *People v. Perez* (2000) 82 Cal.App.4th 760, 766.)

We also note that defendant declined to exercise his opportunity to cross-examine Tupuo. The trial court reasonably held it could not determine if defendant had been denied his right to cross-examine Tupuo because defense counsel did not cross-examine him. Counsel asked only whether Tupuo would know anything if he was asked a question. Simply asking Tupuo if he would know anything did not establish Tupuo was effectively unavailable as a witness. Defendant had the opportunity the Sixth Amendment gave to him as declared by *Owens*, and he did not take advantage of it. That tactical choice does not constitute constitutional error.

In correspondence after briefing was completed, defendant asserted *Murillo, supra,* 231 Cal.App.4th 448, was relevant to his case. *Murillo* is distinguishable because it concerned a refusal to answer, not a loss of memory. In that case, a witness, who identified the defendant before trial in a photographic lineup, refused to answer questions at trial. His identification to police was the only eyewitness identification of the defendant. The trial court allowed the prosecution to ask the witness 110 leading questions concerning the details of his out-of-court statement and identification. In response to each of the prosecutor's questions, the witness said he had " 'nothing to say' " or did not respond. (*Id*. at pp. 450-451.) The trial court allowed the prosecutor to display the photographic lineup on which the witness had circled defendant's photo, along with other photos of the witness himself. The witness refused to answer any

18

questions about these exhibits. The court instructed the jury that the prosecutor's questions were not evidence, and the only facts from the testimony the jury could consider were the witness's physical appearance and his refusals to answer. (*Id*. at pp. 451-452.)

Division Six of the Second District Court of Appeal ruled the prosecutor's detailed questions to the witness, and the witness's refusal to answer the leading questions while the prosecutor read to the jury from his police interviews, denied the defendant the opportunity to cross-examine on what was "tantamount to devastating adverse testimony." (*Murillo, supra,* 231 Cal.App.4th at p. 456.) Quoting from *Douglas v. Alabama, supra,* 380 U.S. at page 420, the court stated effective confrontation of the witness was possible " 'only if [he] affirmed the statement as his.' [Citation.]" (*Murillo, supra,* at p. 456.) Because the witness did not, inferences from his refusal " ' "added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." ' [Citation.]" (*Ibid*.)

The *Murillo* court stated: "[T]here is a point at which the prosecutor's leading questions are tantamount to evidence and overpower the proceedings so that the resulting prejudice is incurable by admonition or instruction. [Citation.]" (*Murillo, supra,* 231 Cal.App.4th at p. 457.) The case before us, however, did not reach that point. Tupuo did not refuse to answer. He claimed loss of memory, and that did not deny defendant an opportunity to cross-examine him or to observe his demeanor and weigh his credibility.

In addition, the prosecutor's questions here did not become tantamount to evidence. None of the prosecutor's questions became significant testimony adverse to defendant. If they would have been answered in the affirmative, the questions would have established, at best, that Tupuo was at the apartment complex in the early evening hours of August 6, 2010, but not later. Such evidence would have added very little to the case against defendant.

19

Defendant also spends much of his opening brief arguing against *People v. Lopez* (1999) 71 Cal.App.4th 1550, 1553-1554 (*Lopez*), in which the Court of Appeal for the Fourth District held that a person who refused to testify under the Fifth Amendment when he actually had no Fifth Amendment right could be called to testify, and, if the witness still refused to testify, the jury could draw inferences from his refusal to testify. *Lopez* does not apply here, as Tupuo did not refuse to testify. He testified he did not remember or know about some of the matters raised in the prosecutor's questions, but he did not refuse to testify or claim he had a right to refuse to testify. He answered the questions, and defendant was free to cross-examine him on those answers and impeach his credibility. That was defendant's right under the Sixth Amendment, and nothing the trial court did denied him of that right. The court did not abuse its discretion denying defendant's motion to strike and allowing the prosecutor to argue inferences from Tupuo's testimony.

## II

### *Instruction on Accomplice Testimony*

Defendant contends the trial court erred when it instructed the jury using a modified version of CALCRIM No. 334, an instruction on accomplice testimony. He asserts giving the instruction violated his due process rights because (1) insufficient evidence supported giving the instruction based on the prosecution's theory that Tupuo was an accomplice; (2) the instruction lightened the prosecution's burden of proof; and (3) the instruction unduly favored the prosecution. We disagree. Sufficient evidence obligated the court to give the instruction.

A.    *Background information*

The trial court proposed instructing the jury with a modified version of CALCRIM No. 334. It proposed to modify the instruction by removing the statement that the defendant had the burden of proving the witness was an accomplice. The prosecutor supported giving the modified instruction. He contended Tupuo was in fact an

20

accomplice, and he intended to argue from Tupuo's testimony that Tupuo was covering up for defendant, his friend.

Defendant opposed giving the instruction. He acknowledged the instruction was to protect him, but he asserted Tupuo gave no testimony on which he could be found to be an accomplice. He believed giving the instruction would make it appear to the jury the court agreed with the prosecutor's theory that Tupuo was an accomplice, and such a tacit agreement would lessen the prosecution's burden of proof.

The trial court disagreed with defendant. It stated the instruction was neutral, or, in other words, did not convey a particular position. The court also stated the instruction was to protect defendant by requiring corroboration of accomplice testimony before the jury could use it against him. The court stated it would further instruct the jury that not all instructions apply depending upon the jury's findings. Finally, the court believed it could be error if it did not give the instruction. Out of an abundance of caution, it decided to give the instruction.

Removing any reference to the defendant having the burden to prove Tupuo was an accomplice, the trial court instructed the jury in pertinent part as follows:

"Before you may consider the testimony of Fine Tupuo as evidence against the defendant, you must decide whether Fine Tupuo was an accomplice to the crimes charged. [¶] . . . [¶]

"If you decide that a witness was not an accomplice, then supporting evidence is not required and you should evaluate his testimony as you would that of any other witness.

"If you decide that a witness was an accomplice, then you may not convict the defendant [of] any of the crimes or allegations charged or any lessers based on his testimony alone. [¶] . . . [¶]

"Any testimony of an accomplice that tends to incriminate the defendant should be viewed with caution. [¶] You may not however arbitrarily disregard it. [¶] You should

21

give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence."

B.      *Analysis*

Defendant contends the trial court gave the accomplice instruction not based on sufficient evidence, but simply on the prosecutor's unsupported theory that Tupuo was an accomplice. We disagree with this argument, as substantial evidence supported the prosecutor's theory that Tupuo was an accomplice.

" '[W]hen there is sufficient evidence that a witness is an accomplice, the trial court is required on its own motion to instruct the jury on the principles governing the law of accomplices,' including the need for corroboration. [Citations.]" (*People v. Tobias* (2001) 25 Cal.4th 327, 331.) When the prosecution alone calls an accomplice or a person whom the jury might determine to be an accomplice to testify, the court must give the instruction on its own motion. (*People v. Guiuan* (1998) 18 Cal.4th 558, 566-567.)

An accomplice is a person "who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.) To be chargeable as an accomplice the witness must be a principal under section 31. (*People v. Whalen* (2013) 56 Cal.4th 1, 58-59 (*Whalen*), cert. denied sub nom. *Whalen v. California* (2013) 134 S.Ct. 183 [187 L.Ed.2d 125].) Section 31 defines principals as "[a]ll persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission . . . ." (§ 31.) " 'Unless there can be no dispute concerning the evidence or the inferences to be drawn from the evidence, whether a witness is an accomplice is a question for the jury.' " (*Whalen, supra,* 56 Cal.4th at p. 59, quoting *People v. Williams* (2008) 43 Cal.4th 584, 636.)

Here, sufficient evidence indicated Tupuo could be liable for the murder as a principal and justified the trial court giving the accomplice instruction. Tupuo lived in the North Avenue Apartments and was friends with defendant and Laki Lee Lopa.

Quentin Watts and Lazarus Bolton told police officers that defendant, Tupuo, and Lopa came into their apartment sometime after midnight the morning of the murder. Surveillance video from cameras at the North Avenue Apartments depicted defendant with two other individuals at the complex around 11:52 p.m. and 1:23 a.m. Law enforcement recovered two different knifes that carried the victim's DNA. The victim was stabbed 20 times and suffered numerous blunt force injuries contemporaneously. The force injuries formed three distinctive patterns. This evidence suggests more than one person may have committed the murder. Even defendant testified he and Tupuo were friends and were together that night. By showing more than one person likely committed the murder, that Tupuo and defendant were friends, and they were together at the apartment complex around the time of the murder, the evidence suggested Tupuo was a principal and required the trial court to give the accomplice instruction.

Defendant, however, claims the court, by giving the instruction, lessened the prosecution's burden of proof. He asserts the instruction required the jury, in order for it to decide if Tupuo was an accomplice, to determine first that defendant was guilty of committing the murder. As a result, any protection the instruction might provide defendant was lost.

We disagree. The instruction does not require the jury to determine the defendant is guilty before determining whether the witness is an accomplice. The instruction requires the jury to review all of the facts to determine first whether the witness was liable as a principal. This could occur if the witness committed the crime without defendant's assistance, or if the witness aided and abetted defendant or someone else in committing the crime. The jury's initial focus under the instruction is on the witness, not the defendant.

Once the jury determines the witness is an accomplice, the instruction does not lessen the prosecution's burden or otherwise favor the prosecution. Rather, it imposes a higher burden of production on the prosecution. The accomplice's testimony cannot be

23

used against the defendant unless other evidence that tends to connect the defendant to committing the offense corroborates it. (§ 1111.) The instruction thus protects a defendant, and in this case, the trial court provided that protection without requiring the defendant to prove the witness was an accomplice. Under these circumstances, the instruction did not direct the jury to presume defendant was guilty and it restricted the prosecution's use of Tupuo's testimony. Consequently, the instruction did not lessen the prosecution's burden or favor the prosecution above defendant.

## III

### *Admission of Evidence of the Media's Coverage of the Murder*

Defendant contends the trial court erred when it admitted evidence of news media about the murder. The prosecution sought to admit the evidence to impeach Natalie Jackson's earlier testimony. Defendant asserts the evidence was not relevant, and its admission violated his constitutional rights of due process and confrontation. We disagree. The evidence was relevant, it was not prejudicial, and its admission for impeachment and not for the truth of the matter did not violate defendant's confrontation rights.

A. *Background information*

In defendant's first trial, Jackson testified she learned of the bag with a hand and knife in it and the need to check the victim's fingernails for DNA from rumors that were "everywhere." "It was on MySpace. It was on the news. It was on the Internet." She did not know the individual names of persons who posted the information on MySpace or the names of people from whom she heard the rumors.

In 2012 before the second trial, the prosecution obtained copies of news articles and television reports about the murder that had been published, posted on the Internet, or broadcast in August 2010. None of these reports contained the detailed information Jackson claimed she had learned from various media that only one hand had been cut off. Some reported witnesses as saying the victim's hands and feet, or arms and legs had been

24

cut off. Others confirmed there had been mutilation, but they reported that police sources stated the victim had not been dismembered to the extent reported by witnesses. The police sources gave no additional information.

The prosecution sought to admit this evidence to impeach Jackson's testimony that she obtained her detailed information from the news and the Internet. The evidence would show Jackson did not obtain her information from some of the sources she claimed. The prosecution was not offering the evidence for its truth, but rather to show that what Jackson said about the murder was not in the public domain as she claimed it was. The evidence bolstered the prosecution's argument that she heard the information directly from defendant.

Defendant objected to admitting the evidence. He argued the evidence was not relevant and would not impeach Jackson, as she did not name a particular news source from which she heard the information. He also contended the evidence was unduly prejudicial under Evidence Code section 352, and it violated his confrontation rights.

The trial court ruled the evidence was admissible. The court found the evidence was relevant because it would eliminate at least two possible sources from which she claimed she had received her information. The evidence was not unduly prejudicial, as neither of the parties contested parts of the stories that were correct or that parts that were incorrect were in fact incorrect. Admitting the evidence also did not violate defendant's confrontation rights, as the evidence was not being admitted for the truth of the matter.

After the evidence was admitted, the court instructed the jury the evidence was not admitted for its truth, but rather only to evaluate Jackson's testimony where she stated she heard information about the case in part from the news. The jury was directed not to consider the evidence for any other purpose.

B.     *Analysis*

Defendant contends the court erred by admitting the evidence. As he did at trial, he asserts the evidence was not relevant and would not impeach Jackson, was unduly

25

prejudicial, and that its admission violated his constitutional right to confrontation.  We disagree.  A trial court's admission of evidence is reviewed for an abuse of discretion. (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 361.)  The court did not abuse its discretion in this instance.

First, the evidence was relevant.  "[R]elevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.'  [Citation.]" (*People v. Jablonski* (2006) 37 Cal.4th 774, 821, quoting Evid. Code, § 210.)  The evidence tended to disprove Jackson's assertion that she learned the detailed information about the murder from news and media sources, as some of the local media Jackson relied upon that reported the crime did not divulge the information Jackson possessed.  That the evidence did not show whether Jackson obtained the information from MySpace or other Internet messaging sites, and that it was obtained two years after the crime, did not render the evidence irrelevant.  Those issues went to the evidence's weight, which the jury could decide.

Second, the evidence was not unduly prejudicial.  Defendant contends the evidence, by eliminating only public media sources and not private ones, had minimal probative value.  He claims its admission unduly prejudiced him, as Jackson's testimony was the only evidence linking him to the murder, and it was crucial for his case that the jury did not believe her.

Defendant misunderstands the prejudice Evidence Code section 352 is designed to prevent.  "The prejudice that [Evidence Code] section 352 ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations]. "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors.  [Citation.]" [Citation.]' [Citation.]  In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant,

26

but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." (*Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1009.)

The trial court was well within its discretion to hold the evidence was not prejudicial under Evidence Code section 352. The media reports admitted into evidence likely did not inflame the jurors' emotions and motivate the jurors to punish defendant based on their emotional reaction. The reports showed no graphic images and were written and presented in a professional manner. They noted a witness's earlier comments that the victim's arms and legs were amputated were corrected by the police spokesman, who stated the mutilation was not so extreme. The evidence was limited in scope and took only a few minutes of trial to present. There was little likelihood the jury would have misused this evidence.

Third, defendant asserts admitting the evidence violated his right of confrontation because Jackson was not confronted with this evidence in the first trial, and he did not have an opportunity to confront Jackson with the evidence in the second trial, where she was an unavailable witness. We disagree with this contention, as the right of confrontation does not extend to nonhearsay testimony admitted to impeach an unavailable witness's earlier testimony.

Pursuant to Evidence Code section 1202, "[e]vidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct. *Any other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing.* . . ." (Italics added.)

27

Here, there is no doubt the media evidence would have been admissible to impeach Jackson's testimony had she testified at the second trial, and thus it was admissible in her absence under Evidence Code section 1202. The admission of the evidence for impeachment, and not for the truth of the matter, does not violate a defendant's confrontation rights. (See *People v. Blacksher* (2011) 52 Cal.4th 769, 808 ["the confrontation clause does not prohibit the prosecution from impeaching the former testimony of its own unavailable witnesses with [her] inconsistent statements, provided those statements are admitted only for impeachment purposes"].)

The media evidence was relevant, was not unduly prejudicial, and did not violate any confrontation right. The trial court did not abuse its discretion admitting it.

IV

*Victim Restitution*

Defendant contends the trial court erred in requiring him to make victim restitution under section 1202.4. He asserts the order is erroneous because (1) the jury acquitted him of committing arson, the crime that directly caused the economic damage; (2) related to the first point, his conduct of murdering the victim was not the proximate cause of the damage; and (3) the court violated his Sixth and Fourteenth Amendment rights under *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435] (*Apprendi*) to have a jury determine victim restitution. We disagree. Defendant's conduct was a proximate cause of the economic loss, and *Apprendi* does not apply to direct restitution orders.

A.     *Background information*

At sentencing, the trial court ordered defendant to pay direct restitution to the victim's daughter, Shalini, in the amount of $13,700. $4,500 of that amount was to reimburse Shalini for the clothing and household items destroyed in the fire.

At a restitution hearing, defendant challenged the direct restitution order to the extent it required him to pay the $4,500. He contended he was not obligated to pay for items destroyed in the fire because the jury had acquitted him of committing arson.

28

The trial court disagreed with defendant. The court ruled that although the jury acquitted defendant of arson, the entire circumstances surrounding the murder made restitution appropriate because the fire was set to destroy evidence of the murder. The court imposed the $4,500 as part of the direct restitution order.

B.     *Analysis*

We review the trial court's restitution order for abuse of discretion. (*Luis M. v. Superior Court* (2014) 59 Cal.4th 300, 305.)

The California Constitution expresses "the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer." (Cal. Const., art. I, § 28, subd. (b)(13)(A).) "Restitution shall be ordered from the convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss." (Cal. Const., art. I, § 28, subd. (b)(13)(B).)

Section 1202.4 implements this constitutional mandate. That statute expresses the Legislature's intent "that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime." (§ 1202.4, subd. (a)(1).) Except in circumstances not relevant here, "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court. . . ." (§ 1202.4, subd. (f).) To the extent possible, the restitution order "shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct . . . ." (§ 1202.4, subd. (f)(3).)

"When judgment is imposed and the defendant sentenced to a period of incarceration (in prison or jail), the court may order restitution only for losses arising out

29

of the 'criminal conduct for which the defendant has been convicted.' (*People v. Lai* (2006) 138 Cal.App.4th 1227, 1247 []; see *People v. Woods* (2008) 161 Cal.App.4th 1045, 1049 [] [limiting restitution in this context 'to those losses arising out of the criminal activity that formed the basis of the conviction']; *People v. Percelle* (2005) 126 Cal.App.4th 164, 179-180 (*Percelle*) [same].)" (*People v. Walker* (2014) 231 Cal.App.4th 1270, 1274.)

This, however, does not mean the court could not require defendant to make restitution simply because he was acquitted of one of the many counts charged against him. "The introductory paragraph of section 1202.4 states the legislative intent, i.e., that the victim of a crime should receive restitution directly from any defendant *convicted of that crime.* This language is clear and unambiguous. Indeed, our Supreme Court has recognized that ordinarily, an acquittal would preclude the court from including the loss related to that crime in a restitution order. (See [*People v. Lent* (1975)] 15 Cal.3d [481,] 487.) *That is not to say that an acquittal on one count will preclude the imposition of a restitution order under all circumstances.* We merely hold that in the nonprobation context, a restitution order is not authorized where the defendant's *only* relationship to the victim's loss is by way of a crime of which the defendant was acquitted." (*Percelle, supra,* 126 Cal.App.4th at p. 180, first italics in original, others added.)

Here, of course, defendant's relationship to Shalini's loss arises not only from an arson for which defendant was acquitted, but also from a murder for which he was convicted. Accordingly, the trial court's task was to determine whether the criminal conduct for which defendant was convicted was the proximate cause of the damage to Shalini's clothing and household items. (See *People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1320-1322; *People v. Jones* (2010) 187 Cal.App.4th 418, 425 (*Jones*).)

California courts have adopted the "substantial factor" test for analyzing proximate cause. "California has definitively adopted the substantial factor test of the

Restatement Second of Torts for cause-in-fact determinations. (*Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041, 1044, fn. 2, 1052, fn. 7.) Under that standard, a cause in fact is something that is a substantial factor in bringing about the injury. (*Id.* at pp. 1052-1053; Rest.2d Torts, § 431, subd. (a), p. 428; [CACI No. 430 (2014)].) The substantial factor standard generally produces the same results as does the 'but for' rule of causation which states that a defendant's conduct is a cause of the injury if the injury would not have occurred 'but for' that conduct. (*Mitchell v. Gonzales*, *supra*, 54 Cal.3d at p. 1053; Prosser & Keeton on Torts (5th ed. 1984) § 41, p. 266.) The substantial factor standard, however, has been embraced as a clearer rule of causation – one which subsumes the 'but for' test while reaching beyond it to satisfactorily address other situations, such as those involving independent or concurrent causes in fact. (*Mitchell v. Gonzales*, *supra*, 54 Cal.3d at pp. 1052-1053; *Thomsen v. Rexall Drug & Chemical Co.* (1965) 235 Cal.App.2d 775, 783; Prosser & Keeton on Torts, *supra*, § 41, pp. 266-268.)

Defendant contends his actions in committing the murder were not a substantial factor in damaging Shalini's clothes and household items lost in the fire. The evidence showed the fire was started after the victim died. There was no evidence regarding who started the fire or when it was started. And the jury was not instructed to consider whether defendant aided and abetted the commission of arson or whether the arson was a natural and probable consequence of the murder. These points, defendant claims, indicate his actions were not the proximate cause of Shalini's damages.

Defendant applies the substantial factor test too narrowly. The test, put simply, is whether Shalini would have incurred damages had there been no murder. The answer is clearly no. Thus, the criminal conduct by defendant and his accomplices was a substantial factor and the proximate cause of Shalini's damages, and she is entitled to compensation.

Defendant asserts the acts of setting the body and the apartment on fire were independent intervening causes and could not subject him to liability for restitution. We

disagree. " ' "In general, an 'independent' intervening cause will absolve a defendant of criminal liability. [Citation.] However, in order to be 'independent' the intervening cause must be 'unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause.' [Citation.] On the other hand, a 'dependent' intervening cause will not relieve the defendant of criminal liability. 'A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act, the intervening act is "dependent" and not a superseding cause, and will not relieve defendant of liability. [Citation.] "[ ] The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. [ ] The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act." ' " ' [Citation.]" (*Jones, supra,* 187 Cal.App.4th at p. 427, quoting *People v. Cervantes* (2001) 26 Cal.4th 860, 871.)

Here it was reasonably foreseeable that defendant or his accomplices would act to destroy evidence where the victim, while still alive, obtained defendant's DNA under his fingernails, and that such actions to destroy evidence could cause harm or damage, including the damage Shalini suffered. Under these circumstances, we cannot say the trial court abused its discretion in determining defendant's actions were the proximate cause of Shalini's economic losses and that there was no independent intervening cause.

Additionally, defendant contends the decision to grant direct victim restitution must, under *Apprendi* and *Southern Union Co. v United States* (2012) __ U.S. __ [132 S.Ct. 2344; 183 L.Ed.2d 318] (*Southern Union*), be subject to a jury determination and be established beyond a reasonable doubt. He asserts that since section 1202.4 does not authorize imposing a financial order for a crime of which defendant was acquitted, the $4,500 is essentially an additional penalty to the statutory maximum of $10,000

32

proscribed for a restitution *fine.* (See § 1202.4, subd. (b)(1).) He thus claims the order is a penalty that exceeds the statutory maximum and is subject to jury approval. We disagree.[5]

First, we have already determined the trial court did not abuse its discretion by requiring defendant to pay Shalini the $4,500 as direct restitution under section 1202.4. Thus, the order does not impose an additional restitution fine.

Second, because the grant of a direct restitution order is not a monetary penalty, it is not subject to *Apprendi* and *Southern Union.* Prior to *Southern Union*, the *Apprendi* court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond *the prescribed statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi, supra,* 530 U.S. at p. 490, italics added.)

Thereafter, in *Southern Union.*, the United States Supreme Court held that Sixth Amendment right to a jury applies to "sentences of criminal fines." (*Southern Union, supra*, __ U.S. at p. ___ [183 L.Ed.2d at p. 325].) In reaching its decision, the Supreme Court held that "[c]riminal fines, like . . . other forms of punishment, are penalties inflicted by the sovereign for the commission of offenses." (*Id.* at p. ___ [183 L.Ed.2d at p. 327].)

However, neither *Apprendi* nor *Southern Union* applies to direct victim restitution because direct victim restitution is not a criminal penalty. (*People v. Pangan* (2013) 213

---

[5]     The Attorney General asserts defendant forfeited this argument by not raising it below. However, at the time of sentencing, courts had not yet held, as the Supreme Court held in *Southern Union*, that a right to a jury determination applied to sentences of criminal fines. Thus, defendant's claim was not forfeited. (See *People v. Black* (2007) 41 Cal.4th 799, 810 ["although challenges to procedures or to the admission of evidence normally are forfeited unless timely raised in the trial court, 'this is not so when pertinent law later changed so unforeseeably that it is unreasonable to expect trial counsel to have anticipated the change' "].)

Cal.App.4th 574, 585-586.)  "[D]irect victim restitution is a substitute for a civil remedy so that victims of crime do not need to file separate civil suits.  It is not increased 'punishment.' "  (*Id*. at p. 585.)  Section 1202.4 imposes no statutory limits on the amount of direct restitution a court may order.

For the same reasons, the court's determination may be established by a preponderance of the evidence.  The higher standard of proof applies to facts that increase a crime's penalty beyond what a judge could impose based on the applicable statute and the facts in the record.  (*Blakely v. Washington* (2004) 542 U.S. 296, 301 [159 L.Ed.2d 403, 412] (*Blakely*).)  Since direct restitution is not a criminal penalty and is not subject to a statutory maximum amount, it is not subject to a jury trial and may be imposed based on the preponderance of the evidence.

V

*Imposition of Jail Booking and Classification Fees*

Defendant contends insufficient evidence supports the trial court's finding he had the ability to pay jail booking and classification fees imposed pursuant to Government Code section 29550.2.  Defendant did not object to the fees at trial.  After the parties completed their original briefing in this matter, the Supreme Court determined a failure to object to the imposition of booking fees at sentencing forfeits the contention on appeal.  (*People v. McCullough* (2013) 56 Cal.4th 589, 591, 598.)  Defendant's failure to object at trial forfeits the contention here.

VI

*Imposition of Restitution Fines*

Defendant contends the trial court erred by imposing two $10,000 restitution fines under sections 1202.4, subdivision (b), and 1202.45 respectively.  He asserts the court, by not considering his ability to pay, violated his right to due process by imposing a fine greater than the statutorily mandated minimum amount without a jury determination made beyond a reasonable doubt.  We disagree.  We infer from the record that the court

34

considered his ability to pay, and the imposition of his restitution fines were not required to be made by a jury.[6]

Defendant asserts the statutory maximum fine the court could impose solely on the basis of facts in the record was $200. Any greater amount, defendant argues, would require under *Apprendi* a jury determination that the defendant has the ability to pay the higher fine, a fact not reflected in the record. Defendant misreads the statutes.

When defendant was sentenced in 2010, section 1202.4, subdivision (b), provided: "In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record." The statute provided a range from a minimum amount of $200 to a maximum of $10,000 for felony convictions. (§ 1202.4, former subd. (b)(1); Stats. 2009, ch. 454, § 1.) The statute provided that a defendant's inability to pay "shall not be considered a compelling and extraordinary reason not to impose a restitution fine. Inability to pay may be considered only in increasing the amount of the restitution fine in excess of the two hundred-dollar ($200) . . . minimum." (§ 1202.4, former subd. (c); Stats. 2009, ch. 454, § 1.)

The statute provided that in setting the restitution fine in excess of the minimum, "the court shall consider any relevant factors including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered any losses as a result of the crime, and the number of victims involved in the crime. . . . Express findings by the court as to the

---

[6]     The Attorney General argues defendant forfeited this claim by failing to raise it at trial. Again, because *Southern Union* had not been decided by the time of sentencing, we hold defendant did not forfeit his claim.

factors bearing on the amount of the fine shall *not* be required. . . ." (§ 1202.4, former subd. (d), italics added; Stats. 2009, ch. 454, § 1.)

Also, when defendant was sentenced in 2010, section 1202.45 required the court to impose a parole revocation restitution fine in the same amount as that imposed under section 1202.4, subdivision (b). (Former § 1202.45; Stats. 2007, ch. 305, § 15 (SB 425).)

We presume the trial court complied with its obligations under section 1202.4 and considered defendant's ability to pay. (Evid. Code, § 664; *People v. Mosley* (1997) 53 Cal.App.4th 489, 496 (*Mosley*).) Because the court sought to impose a higher fine, it was required to consider defendant's ability to pay. However, it was not required to make any express findings that defendant had the ability to pay, and the absence of those findings does not demonstrate the court failed to consider this factor. (*People v. Nelson* (2011) 51 Cal.4th 198, 227.) We indulge all intendments to support the court's order on matters as to which the record is silent. Error must be affirmatively shown (*Mosley, supra,* 53 Cal.App.4th at p. 496), and it has not been shown here.

In addition, the imposition of a fine greater than the $200 minimum did not grant defendant a jury trial right on the issue. *Southern Union, Blakely*, and *Apprendi* do not apply where, as here, the trial court exercises its discretion within a statutory range and does not make any factual findings that increase the potential fine beyond what the jury's verdict allows. (*People v. Kramis* (2012) 209 Cal.App.4th 346, 351-352.) The statutory range under sections 1202.4 and 1202.45 in this case is between $200 and $10,000. Because the court did not impose a fine greater than that range, defendant was not entitled to a jury trial on the issue of the fine. (*Ibid.*)

DISPOSITION

The judgment is affirmed.

      NICHOLSON     , Acting P. J.

We concur:

      HULL       , J.

      MURRAY     , J.