Filed 1/5/23  P. v. Moyer CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>PAULA MOYER,<br><br>        Defendant and Appellant. | A162665<br><br>(Solano County<br> Super. Ct. No.<br> FCR240919) |

Paula Moyer appeals from an order denying her motion to reduce her obligation for victim restitution (Pen. Code, § 1202.4, subd. (f)) after her felony murder conviction was vacated and she was resentenced for burglary pursuant to Penal Code section 1170.95.[1]  She contends she should not have to pay restitution for expenses related to the death of her burglary victim, because her conduct in planning and assisting the burglary was not the proximate cause of his death.  We will affirm the order.

I. <u>FACTS AND PROCEDURAL HISTORY</u>

Moyer and her accomplices, James Ray and Christopher Morgan, were convicted of the first-degree murder of 78-year-old Farhan Jweinet, whom Ray and Morgan beat during a burglary that Moyer planned.  For context, we

---

[1]     All statutory references herein are to the Penal Code.

begin with a summary of the evidence as stated in our decision in Moyer's appeal from the judgment.[2]

A.  Evidence at Trial

Victim Farhan Jweinat lived in the Vacaville home of his son Suleiman and his family.  Despite suffering from coronary artery disease, Farhan was in good health for his age.[3]

On the afternoon of May 5, 2006, while other family members were not home, neighbors discovered Farhan standing in the front yard, covered in blood, with his hands tied behind his back.  Farhan said in broken English, "[T]hey won't stop hitting me, they won't stop hurting me, they just keep hitting me over and over."  He said they wanted money and he gave them $700.  Farhan was taken to the hospital, where he told Detective Carey of the Vacaville Police Department that his attackers were two "American" men in their 30's.

Farhan's daughter-in-law, Vera Jweinat, rushed home after learning what happened.  She walked through the house with Detective Carey and saw that every room had been ransacked.  There was blood on the floor in the kitchen, family room, Farhan's bedroom and an adjacent bathroom.  Farhan's bedroom, which was usually spotless, was in disarray, and his dentures were found in a large pool of blood in the kitchen.  In her bedroom, Vera found a bottle of pepper spray that did not belong to her, and Detective Carey smelled

---

[2]  Moyer filed a request for us to take judicial notice of our decisions in *People v. Ray* (Sept. 8, 2011, A127613, A127690) [nonpub. opn.] [2011 Cal. App. Unpub. LEXIS 6790, *16–17] [appeal from the judgment] and *In re Moyer* (Mar. 14, 2017, A147508) [nonpub. opn.] [2017 Cal. App. Unpub. LEXIS 1758] [granting habeas petition].  We deferred ruling on the request until our consideration of the merits.  We now grant it.

[3]  Because they share the same last name, we refer to the Jweinet family members at times by their first names, for clarity and without disrespect.

pepper spray and saw what appeared to be pepper spray on the kitchen floor. Vera discovered that gold jewelry worth between $50,000 and $70,000 was missing, as was a computer and other items. A neighbor had seen a blue car parked in the Jweinats' driveway and noticed a woman with long black hair and a red sweater near the car.

Appellant Moyer—who had long black hair—had recently worked as a housekeeper for the Jweinats. Farhan was at the house when Moyer cleaned. Roughly two months earlier in March 2006, Vera discovered that roughly $60,000 to $70,000 was missing from its hiding place in her master bedroom, and she suspected Moyer of taking it. Vera reported the theft to police but asked them to stop the investigation because her daughter was afraid. Vera asked Moyer to return for one final cleaning job, intending to confront her, but Vera decided not to raise the subject when Moyer came over.

1. Police Investigation

After reviewing the police report regarding the March 2006 theft, Detective Carey contacted Moyer at her house the night of the burglary (May 5). They found Vera's black ring on the counter next to Moyer's purse. Inside the purse, they found Vera's bracelet and a receipt from a McDonald's located about half a mile from the Jweinat's home; the receipt was generated at 12:33 p.m. that day. Moyer's boyfriend, Paul Hinojosa, was at the house and his black Acura was parked in the driveway. The car was impounded, and in a search of the vehicle police found three rings belonging to Vera and a red sweatshirt.

After interviewing Moyer, police went to the home of Moyer's neighbors, James Ray and his girlfriend Karly Harrison. Ray was discovered hiding under the bed with over $400 in his wallet. Another $200 was inside the pocket of shorts, a handgun was under the mattress, and jewelry

3

belonging to Vera was stashed in the bedroom closet. Black pants found in the house tested positive for Farhan's blood.

       2. <u>Account of the Incident at Trial</u>

Karly Harrison ultimately pled guilty to first degree burglary in exchange for her truthful testimony at trial. She testified that Moyer had bragged about taking $74,000 from a house in Vacaville while working as a housekeeper, claiming she purchased two cars with the money after spending $5,000 on drugs and in casinos. In March 2006, Moyer told Harrison she had been called to clean the house again, although she was nervous it might be a "setup."

Moyer, Moyer's boyfriend Hinojosa, and Harrison's boyfriend Ray discussed burglarizing the Jweinats' house. The burglary was initially planned for May 4, 2006, but did not go forward. Hinojosa could not participate the next day, so his brother, Christopher Morgan, took his place.

Early the next morning (May 5), Moyer went to Harrison's house with a line of methamphetamine for Harrison and some beanies, walkie talkies, and gloves. Harrison, aware that they were going to burglarize the Jweinats' house, drove with Ray to Vacaville in Ray's blue Corsica. They met Moyer and Morgan, who arrived in Hinojosa's black Acura, at a McDonald's near the Jweinats' home. After having lunch, Moyer and Harrison got into the Acura, while Ray and Morgan got into the Corsica. Moyer led the way to the Jweinats' house, parked, and then conferred with Ray and Morgan. Ray parked his car in the Jweinats' driveway and went to the house with Morgan. Moyer received a call on her cell phone and told the caller to use the back door because it was always open.

As Moyer and Harrison were waiting in the Acura, Moyer changed into a red sweatshirt. After about 10 minutes, Moyer told Harrison to drive her to

4

the Jweinats' house so she could "get them out." Moyer went inside the house while Harrison drove back to their original parking place. About 10 minutes later, Moyer, Ray and Morgan came out of the house and got into Ray's blue Corsica, and Harrison met them back at the McDonald's. Morgan had blood on his clothes. From there, Moyer and Morgan drove away in the Acura, and Ray and Harrison went home in the Corsica. Ray told Harrison that everything had "got all fucked up," and "the less you know the better." He showed her a gun in a holster and told her he got it during the burglary. Later that day, Moyer, Hinojosa and Morgan went to Ray's and Harrison's house and divided up jewelry, watches, "little bags," shoes, clothing and a computer.

Mariah Alsop testified that on the day after Moyer's arrest, Morgan told Alsop he was "so scared" "because they're looking for me." Morgan explained that he and Ray had entered a house, found an old man there, bound him, and told him nothing would happen if he kept his mouth shut. After Morgan went upstairs to look for things to steal, he heard Ray yelling, "You better get the f—down here, I just hit this old man." Morgan went downstairs and saw Ray viciously beating the old man, who had blood running down his head. Morgan told Alsop that he joined Ray in beating the elderly man.[4]

### 3. Farhan's Death

On the day of the burglary, Farhan was admitted to the hospital in critical condition. Surgery was performed on his broken jaw on May 12, 2006, and he remained in critical condition in the intensive care unit until May 16, 2006, when he was transferred to another unit. On May 17, 2006, he suffered a cardiac arrest and stopped breathing, which deprived his brain of

---

[4]     Ray testified that he had not participated in the crimes at all.

oxygen. Although resuscitated, he remained in a vegetative state until he died on March 19, 2007. An autopsy determined that the cause of death was "anoxic encephalopathy (loss of oxygen to the brain) due to blunt force injuries."

Dr. Josselson, a forensic pathologist who testified as the prosecution's expert witness at trial, opined that the assault during the burglary led to a chain of events causing Farhan's cardiac arrest and, as a result of the cardiac arrest, Farhan went into a vegetative state and died.

Appellants argued that they were not liable for felony murder or special circumstances because Farhan's injuries did not cause his death. Dr. Coleman Ryan, a cardiologist, characterized the cause of death as a "mystery" but did not believe Farhan's injuries caused the cardiac arrest. Dr. Steven Karch, an expert in cardiac pathology, opined that the cause of death was undetermined but not a heart attack.

B. Judgment, Sentence and Appeal

The jury found Moyer, Morgan, and Ray guilty of first-degree murder (§§ 187, subd. (a), 189). It also found true the special circumstance allegations that Morgan and Ray committed the murder during the course of a robbery and a first-degree burglary and that Moyer committed the murder during the course of a first-degree burglary (§ 190.2, subd. (a)(17)(A) & (G)).

Moyer was sentenced to prison for life without the possibility of parole. She was also ordered to pay $75,596 in restitution for expenses claimed by the victim's family, including $50,000 for jewelry stolen during the burglary, $7,000 for medical and mental health expenses, and $18,596 for funeral and burial expenses.

6

Moyer and her accomplices appealed their convictions, asserting among other things that the injuries inflicted during the attack were not the cause of Farhan's death.  This court affirmed the judgment in 2011.

C.  Moyer's Habeas Petition and Resentencing

In 2015, after our Supreme Court decided *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), Moyer filed a petition for a writ of habeas corpus, arguing that the evidence was insufficient under *Banks* to support the felony-murder special circumstance.  We denied the petition without prejudice. Moyer filed a habeas petition in the superior court, which denied the petition on the merits and on procedural grounds.

In 2016, Moyer filed another petition for a writ of habeas corpus in this court, again asking us to set aside the true finding on the felony-murder special circumstance based on *Banks*.  While the case was pending, our Supreme Court decided *People v. Clark* (2016) 63 Cal.4th 522.  In light of *Banks* and *Clark*, we ruled the evidence was insufficient to show that Moyer acted with reckless indifference to human life, as required for a special circumstance finding under section 190.2, subdivision (d).

In December 2018, Moyer petitioned for resentencing under section 1170.95.  Neither the resentencing petition nor the order on the petition is in the appellate record, but references in the record suggest the court granted her petition in May 2019 and resentenced Moyer to a six-year term for the burglary conviction with credit for time served.

D.  Subject Motion to Modify Restitution

In April 2021—nearly two years after her resentencing for burglary— Moyer filed a motion in the superior court to modify victim restitution.  She argued that the vacatur of her murder conviction and her resentencing limited her liability for restitution to economic losses resulting from the

7

burglary alone. The People opposed the motion, arguing that Moyer's criminal conduct was a substantial factor in the victim's death.

The superior court denied Moyer's motion. The court explained: "Although she was resentenced pursuant to the change in the law, she still was an active participant in the events that ultimately led to the loss of life and I believe that the restitution was rightly ordered. And I'm going to deny the modification of restitution, and the restitution order will stay as stands." This appeal followed.

## II. DISCUSSION

Moyer contends the court abused its discretion by declining to reduce the victim restitution order by $25,596. In particular, she argues that her conduct was not a proximate cause of the expenses for medical, mental health, funeral, and burial expenses.

### A. Forfeiture

Citing *People v. Lamoureux* (2020) 57 Cal.App.5th 136, 151–152 (*Lamoureux*), respondent contends Moyer waived or forfeited her challenge because she did not raise it when seeking resentencing or at any time after this court set aside the special circumstance for felony murder.

We are not persuaded. As respondent acknowledges, *Lamoureux* involved a restitution fine under section 1202.4, subdivision (b), not an order of direct victim restitution under section 1202.4, subdivision (f). Section 1202.4, subdivision (f) does not state any time limit for a defendant to seek modification of a victim restitution order, and while trial courts do not have continuing jurisdiction over restitution fines, they *do* have continuing jurisdiction over direct victim restitution. (*People v. Turrin* (2009) 176 Cal.App.4th 1200, 1207–1208; *People v. Bufford* (2007) 146 Cal.App.4th 966, 970–972.) Furthermore, the defendant in *Lamoureaux* had not challenged

8

the restitution fine in the trial court. (*Lamoureaux, supra*, 57 Cal.App.5th at p. 151.) Here, Moyer challenged the victim restitution order in the trial court by filing the motion to modify it. We proceed to the merits.[5]

B. <u>Victim Restitution</u>

Consistent with the California Constitution, article I, section 28, subdivision (b), it is our Legislature's intent "that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime." (§ 1202.4, subd. (a)(1); see *People v. Giordano* (2007) 42 Cal.4th 644, 656.) Section 1202.4, subdivision (f) provides that, with exceptions inapplicable here, "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." We review a restitution award for an abuse of discretion and will not reverse unless the award is arbitrary or capricious. (*People v. Kelly* (2020) 59 Cal.App.5th 1172, 1181.)

To the extent possible, the restitution order "shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss *incurred as the result of the defendant's criminal conduct*." (§ 1202.4, subd. (f)(3), italics added.) Whether loss is incurred as a result of

---

[5] Respondent also argues that we must affirm because Moyer has not provided any record of the original restitution order, the resentencing hearing, or any order of restitution made at that hearing, and an appellant must provide an adequate record to demonstrate error. (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295–1296; *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) However, Moyer *has* provided a record of the hearing on her motion to modify restitution, and that is the proceeding that is the subject of this appeal.

the defendant's criminal conduct turns on the application of tort principles of causation. (*People v. Jones* (2010) 187 Cal.App.4th 418, 425 (*Jones*); *People v. Trout-Lacy* (2019) 43 Cal.App.5th 369, 372 (*Trout-Lacy*); *People v. Foalima* (2015) 239 Cal.App.4th 1376, 1396 (*Foalima*).)

Causation in tort law has two components: (1) cause in fact—that is, the defendant's act must be a necessary antecedent of the event (the "but for" cause or a "substantial factor"); and (2) an aspect of proximate cause that turns on public policy considerations limiting an actor's responsibility for the consequences of their conduct. (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 352–353; *Trout-Lacy, supra*, 43 Cal.App.5th 369 at p. 372; *Jones*, *supra*, 187 Cal.App.4th at pp. 424–425.)

The cause in fact component is not at issue here. Moyer acknowledges that "there is no question that Moyer's criminal conduct was a cause in fact of Farhan's death" and "the existence of a direct causal connection between Moyer's conduct and Farhan's death is, therefore, not disputed in this case." As we observed when granting Moyer's habeas petition, her planning of the burglary " 'set in motion the series of events leading to [Farhan's] . . . death.' " (*In re Moyer* (Mar. 14, 2017, A147508) 2017 Cal. App. Unpub. LEXIS 1758, *46 [nonpub. opn.] (*Moyer*).) As determined in Moyer's direct appeal from her conviction, substantial evidence supported the conclusion that Farhan's injuries were the cause of his death. (*People v. Ray* (Sep. 8, 2011) 2011 Cal. App. Unpub. LEXIS 6790, *16–17 [nonpub. opn.] (*Ray*).)

Nonetheless, Moyer argues that her planning and assisting in the burglary was not the proximate cause of Farhan's death because the events that unfolded between her actions and his death were independent intervening causes absolving her of liability.

10

For an intervening cause to absolve a defendant of victim restitution liability, however, the intervening cause must be *unforeseeable*—an extraordinary and abnormal occurrence. (*Foalima, supra*, 239 Cal.App.4th at p. 1397; *Jones, supra*, 187 Cal.App.4th at p. 427.) Otherwise, the intervening cause will not insulate the defendant from liability. (*Foalima*, at p. 1397; see *People v. Cervantes* (2001) 26 Cal.4th 860, 871 [for criminal liability to apply, the consequence need not have been foreseen or a strong probability; only a possible consequence that might reasonably have been contemplated].)

Here, it was reasonably foreseeable that Moyer's planning and assisting the burglary would lead to Farhan's death, and each link in the chain of events was reasonably foreseeable from Moyer's acts. Because Moyer knew that the elderly Farhan was at the house when she cleaned the home, his presence during the burglary was reasonably foreseeable. In addition, having been asked to clean the house one final time after stealing $74,000 from the family, Moyer was nervous it might be a setup, suggesting her belief that the family knew she had stolen the money. The family's suspicion made it all the more likely one or more family members would remain at the home to protect it and a confrontation with a burglar would result. With that confrontation, violence could foreseeably occur and with that violence, injury or even death to the 78-year-old victim.

Moyer points us to a statement we made in *Moyer*, *supra*, 2017 Cal. App. Unpub. LEXIS 1758, when granting Moyer's habeas petition. We stated that it could be inferred from the jury's not-true finding on the robbery-murder special circumstance that the jury was not persuaded Moyer *knew* Farhan would be home on the day of the robbery despite the fact he had been home on prior occasions. (*Id.*, at *30–31.)

11

*Moyer*, however, involved a different issue. There, the question was whether Moyer had acted with reckless indifference to human life, which requires not just that death is foreseeable, but that the defendant "knowingly create[ed] 'a grave risk of death.'" (*In re Scoggins* (2020) 9 Cal.5th 667, 677.) In that context, we concluded the evidence was insufficient to prove that Moyer *knew* Farhan would be home. (*Moyer*, *supra*, 2017 Cal. App. Unpub. LEXIS 1758, *30.) Here, by contrast, the question is not whether Moyer knew that Farhan would be home or whether Moyer acted with reckless indifference, but merely whether it was reasonably foreseeable that Farhan would be there.

 Moyer next argues that she took steps before and during the burglary to ensure that the house would be unoccupied. She called off the burglary on the previous day because she thought the children might be home from school. She told Harrison the house was supposed to be empty. On the morning of the burglary, she said she had driven by the smoke shop and " 'they're all there. The house should be clear.'" (*Moyer, supra*, 2017 Cal. App. Unpub. LEXIS 1758, *30.) Further, while the burglary was in progress, Harrison and Moyer acted as lookouts to make sure no one came home.

But none of this made it less foreseeable that *Farhan* would be at the house. Moyer's statement that "they" were all at the shop and not at the house was of course false—or did not pertain to Farhan—since Farhan *was* at the house. Being a lookout to ensure that no one arrives to interrupt the burglary does nothing to protect the victim who was already in the house. Whether or not Moyer claimed the house would be unoccupied, it was not unforeseeable that the elderly Farham would be in the home that Moyer dispatched others to burglarize, just as he had been when she came to clean.

12

Moyer further insists it was not reasonably foreseeable that her accomplices would respond to an encounter with one of the home's occupants by resorting to violence requiring the victim's hospitalization and surgery. She points out that we said in *Moyer* that she "did not plan a residential robbery in which force against the victim was contemplated in advance," supplied Ray or Morgan with a weapon, believed they were armed, or were aware they possessed a propensity for violence. (*Moyer, supra*, 2017 Cal. App. Unpub. LEXIS 1758, *34–36.) Again, however, our statement was in the context of evaluating the evidence for reckless indifference for human life, not the mere foreseeability of violence or death from the burglary. It is well-recognized that the burglary of a residence poses a threat to personal safety, including " ' "the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence." ' " (*Magness v. Superior Court* (2012) 54 Cal.4th 270, 275.) Violence and physical injury are reasonably foreseeable when planning a residential burglary under the circumstances here.

Moyer lastly suggests it was not reasonably foreseeable that Farhan, who was in good health for his age, would experience complications after surgery, leading to cardiac arrest and death. However, Farhan was 78 years old. If violence broke out, it is reasonably foreseeable a beating by Ray and Morgan would result in consequences including Farhan's death. While death might not have been a strong probability, it was a possible consequence that might reasonably have been contemplated. (*Foalima, supra*, 239 Cal.App.4th at p. 1397.) Moyer has not established an abuse of discretion.

## III. DISPOSITION

The order is affirmed.

13

_____

WISEMAN, J. [*]

We concur.

_____

JACKSON, P.J.

_____

SIMONS, J.

*People v. Moyer* / A162665

_____

[*]     Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14