Filed 12/1/25  P. v. Nunez CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JULIAN ANTHONY NUNEZ et al.,<br><br>    Defendants and Appellants. | 2d Crim. No. B327080<br>(Super. Ct. No. 2020002112)<br>(Ventura County) |

A shooting atop a Ventura parking structure in 2020 left one man dead and another wounded.  Appellants Raymond Max Bolanos and Julian Anthony Nunez were charged jointly in connection with the shooting.

A jury convicted Bolanos on four counts:  second degree murder (count 1; Pen. Code, §§ 187, subd. (a), 189, subd. (b))[1]; attempted murder (count 2; §§ 664/187, subd. (a)); possession of a

---

[1] Unlabeled statutory cites are to the Penal Code.

firearm by a felon (count 3; § 29800, subd. (a)(1)); and shooting from a motor vehicle (count 7; § 26100, subd. (c)). The jury found firearm enhancements true on counts 1, 2, and 7 (§ 12022.53, subd. (d)), as well as an enhancement for shooting from a motor vehicle on count 1 (§ 190, subd. (d), and for causing great bodily injury on count 2 (§ 12022.7). It also found true allegations Bolanos committed counts 1, 2, and 7 for the benefit of a criminal street gang. (§ 186.22, subds. (b)(1)(C), (b)(4)(B), (d).) He received an indeterminate term of 90 years to life in prison, plus a determinate term of 19 years and four months.

The jury convicted Nunez on three counts: assault with a semiautomatic firearm (count 4; § 245, subd. (b)); possession of a firearm by a felon (count 5; § 29800, subd. (a)(1)); and possession of an assault weapon (count 6; § 30605, subd. (a).) It found him not guilty of shooting from a motor vehicle (count 7; § 26100, subd. (c)). As to count 4, the jury found true that Nunez was armed with and used a weapon (Cal. Rules of Court, rule 4.421(a)(2)) and "engaged in violent conduct, which indicates a serious danger to society" (*id.*, rule 4.421(b)(1)). It also found he committed count 4 for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).) He received an aggregate term of 19 years and four months in prison.

Bolanos contends, among other things, the trial court erred by declining to instruct the jury on self-defense. Nunez contends the trial court erred by imposing the upper term on his assault charge and by ordering him to pay restitution for economic damages caused by Bolanos's crimes. We will affirm.

FACTS AND PROCEDURAL HISTORY

Police responded to reports of a shooting on the fifth floor of Ventura's Harbor Boulevard parking structure in the early

2

morning of January 18, 2020. They found Emmanuel "Manny" Hernandez on the ground holding his unconscious brother, Alejandro "Alex" Hernandez. Alex[2] was bleeding from the head. As they waited for an ambulance, Manny told officers that he, his brother, and several friends were hanging out in the structure when a red Mustang pulled up next to them. He saw Alex and two others approach the driver's side window and begin talking to the driver and passengers. Someone inside the car fired several gunshots out the window. Alex fell to the ground and the car drove out of the structure. Alex died at the hospital from a single gunshot wound to the head. A second victim, Joel Landin, was treated for a bullet wound to his shoulder and powder burns on his face.

A California Highway Patrol officer overheard radio traffic about the shooting while performing a traffic stop near an offramp of the 101 freeway. He saw the suspect's car exit and followed it into Oxnard. The pursuit continued until the car's driver lost control and stopped. Appellant Bolanos opened the front passenger door and ran away. The officers arrested the driver, Stephanie Sanchez, along with appellant Nunez and Yaritza Mendez. They found a bag in the front passenger seat containing a Smith & Wesson revolver and a Tec-9 semiautomatic pistol.

Police brought Manny Hernandez to the scene of the arrests. He confirmed the Mustang was the car from the structure and Nunez was the passenger in the back seat. Police arrested Bolanos later that day.

---

[2] We use the Hernandez brothers' first names for ease of reference.

3

Police interviewed Sanchez in jail. Sanchez said she was driving around with her friend when Bolanos messaged her. They picked him up in Oxnard then drove to Ventura to pick up his friend Nunez. They decided to hang out at the Harbor Boulevard parking structure. Sanchez knew both men were part of Santa Paula's Crazy Boys gang. She was friends with Bolanos even though she grew up in Oxnard and was a member of the Southside Chiques gang.

Sanchez drove to the structure and parked near the top. Her friend had since passed out in the back seat after taking too much Xanax. As she and Bolanos talked, a white sedan playing loud music drove past them and parked farther up the structure. She heard several people get out of the sedan but could not see them. One person kept whistling or catcalling in their direction like they knew or "had a problem" with her. This went on for about ten minutes.

Sanchez reversed out of their parking spot and drove over to the white car. She saw about five or six men, including Alex Hernandez. One of them was riding a skateboard. Sanchez asked something like "what's up?" or "what's your problem?" Alex "started . . . trying to get crazy" with them, claiming he was from Ventura Avenue and flashing gang signs. He and two or three others came up to her window. Sanchez said "well, I'm from Southside" and told them to "back off" because they were getting too close and too rowdy. Nunez said, "Crazy Boys." One of the men appeared to reach for something at his waist. Bolanos suddenly pulled out a firearm, reached across Sanchez, and fired through the driver's side window. The weapon nearly hit her in the face. This caught her by surprise because she did not know

4

Bolanos or Nunez had a firearm. She believed Bolanos's "adrenaline got to him" and that he "did it out of protection . . . ."

Bolanos gave her directions as they drove away. Sanchez wanted to stop for police but Bolanos told her to keep driving. Sanchez eventually lost control of the car in Oxnard after making a left turn too quickly. Bolanos ran away from the car after it crashed.

At trial Manny testified that he and Alex worked late on the night of the shooting. They went bar hopping afterwards and met Alex's friend Landin. When the last bar closed, they walked to Alex's white Acura and drove to the parking structure. They picked up three of Landin's friends on the way. Four of them crowded into the back of the car. When they reached the top floor they all got out and he began riding Landin's skateboard.

Manny saw the red Mustang pull up behind Alex's Acura 10 or 15 minutes later. Alex and Landin walked up to the Mustang's window. Thinking the car's occupants were "friends or something," Manny rode over and joined them. He leaned into the window and saw four people inside. He remembered seeing Nunez in the back seat with his hands in his lap. Nunez held up an "Uzi" or "TEC-9" type gun to the window and said "Surtown." Manny started running. He heard three or four gunshots in rapid succession. When he turned around, he saw Alex on the ground and the Mustang driving away. He ran back to his brother and saw him bleeding above the right eye. Landin seemed confused at what had just happened.

Jairus Marshall testified that he was one of the three people Alex picked up on the way to the parking structure. They drove to the top, got out of the car, and began talking and drinking. The Mustang pulled up to them five or ten minutes

later.  He saw Alex, Manny, and Landin walk up to within two feet of the front driver's side window, which was down.  Marshall could not hear what they were saying over the music but he did not sense "anything heightened or aggressive."  About 30 seconds passed.  He then heard three or four "pops" coming from the car.  Alex fell to the ground.  Landin kept repeating "there was a girl in the driver's seat, a guy that they were talking to in the passenger seat and then he had a gun on his lap basically pointed towards the people outside."  Landin heard someone say "Where you from?" and "Southside mother fucker!" before the shooting.  Marshall did not realize Landin had been wounded until they began running away from the structure.  He also saw the side of Landin's face was red.

Sanchez testified that Alex and his friends approached within inches of her window.  They seemed "curious" at first but became aggressive.  She felt they were surrounding the car.  She considered Alex's use of hand signs and claiming Ventura Avenue as threats.  Sanchez said many things she initially told police about Bolanos were only "to protect [herself]."  She did not remember Bolanos reaching across her face with a firearm, shooting it, or directing her where to go when they drove away.  She also did not remember telling police she saw someone reach for their waist.  She acknowledged taking methamphetamine earlier in the evening and swallowing ten doses of Xanax before her arrest to hide them.  The trial court admitted audio and video recordings of Sanchez post-shooting interviews into evidence.

Counsel for Bolanos and Nunez sought jury instructions on self-defense at the close of evidence.  The court denied the request, finding there had been "no evidence of what was known to either defendant at the time of the shooting or what their

6

beliefs were about an imminent danger that may or may not have existed."

The jury initially could not reach unanimous verdicts on counts 1 and 2. In response to a court questionnaire, the jury stated it was 11-1 on the hung counts but would continue deliberating. The next day it reached a verdict. It found Bolanos not guilty of first degree murder but guilty of second degree murder. It also found him guilty of the attempted murder of Landin and shooting from a motor vehicle. The jury found Nunez guilty of assault with a semiautomatic firearm and two firearm possession charges. It found him not guilty of shooting from a motor vehicle.

Bolanos and Nunez admitted prior strike convictions and additional aggravating circumstances. At a bifurcated trial, the jury found both committed their offenses for the benefit of the Crazy Boyz street gang.

Bolanos moved for a new trial. Nunez joined. The trial court denied the motion.

Bolanos received an indeterminate term of 65 years to life for Alex's murder: a base term of 15 years to life, plus five years for shooting a firearm from a vehicle (§ 190, subd. (d)); doubled to 40 years because of his prior strike (§ 667, subd. (e)(1)); plus 25 years on the firearm enhancement (§ 12022.53, subd. (d)). He received a determinate term of 19 years, four months for the attempted murder of Landin, plus an additional indeterminate term of 25 years to life for the firearm enhancement on that charge. The trial court concluded by stating: "So that the record is clear, any discretion the Court might later get, the Court is going to decline [to] exercise any discretion. I do not believe that this case warrants any discretion or any mitigation at all. I think

7

this is senseless.  I think that the defendant absolutely poses a significant risk to public safety.  The Court is going to decline any invitation to deviate from this sentence unless I have made a legal mistake and I have to."

The trial court denied Nunez's motion to strike a prior strike under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 but granted his motion to strike the firearm and gang enhancements under section 1385, subdivision (c)(2)(C).[3]  Nunez received the upper term of nine years for assault with a semiautomatic firearm, doubled to 18 years because of his prior strike, plus one year and four months for the possession of a firearm by a felon.  The trial court imposed the upper term of six years for possession of an assault weapon but stayed the sentence under section 654.

In addition to their prison terms, the trial court ordered Bolanos and Nunez to pay victim restitution to the mother of Alex's two children (Jacqulin Ortiz) and Joel Landin in an amount to be determined.

DISCUSSION

*Denial of Self-Defense Jury Instruction*
*as to Bolanos*

The trial court must instruct the jury "on every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case."

---

[3] Section 1385, subdivision (c)(1) provides that the court "shall dismiss an enhancement if it is in the furtherance of justice to do so . . . ."  Subdivision (c)(2) states "the court shall consider and afford great weight to evidence offered by the defendant to prove" certain mitigating circumstances.  Among these mitigating circumstances is that "[t]he application of an enhancement could result in a sentence of over 20 years."  (§ 1385, subd. (c)(2)(C).)

8

(*People v. Young* (2005) 34 Cal.4th 1149, 1200.) ""Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive."" (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.) "When deciding whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the evidence, but only whether there is evidence which, if believed by the jury, is sufficient to raise a reasonable doubt of guilt." (*People v. Orlosky* (2015) 233 Cal.App.4th 257, 269-270.) "'[T]he existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury.'" (*People v. Moye* (2009) 47 Cal.4th 537, 553, quoting *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12.) Our review is de novo. (*Cole*, *supra*, 33 Cal.4th at p. 1217.)

"'To justify an act of self-defense for [an assault charge under Penal Code section 245], the defendant must have an honest and reasonable belief that bodily injury is about to be inflicted on him.'" (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064, italics omitted.) The belief, in other words, must "subjectively exist[]" and "be objectively reasonable." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) In assessing the belief's reasonableness, "the jury must consider all of the relevant circumstances in which [the] defendant found [himself]." (*Id*. at p. 1083.) Moreover, "[t]he threat of bodily injury must be imminent . . . , and ' . . . any right of self-defense is limited to the use of such force as is reasonable under the circumstances.'" (*Minifie* at pp. 1064-1065; see also *People v. Brady* (2018) 22

9

Cal.App.5th 1008, 1014; *People v. Cruz-Partida* (2022) 79 Cal.App.5th 197, 212.)

Bolanos cites Sanchez's statements to police and trial testimony as supporting a self-defense instruction. This includes the following: that Alex approached their car aggressively and got "all up in [her] face"; Sanchez escalated the confrontation by claiming Southside Chiques; Alex made statements and hand signs claiming allegiance to the Ventura Avenue gang; Sanchez believed the parking structure was Ventura Avenue turf; she heard Bolanos tell the group to "get the fuck off the car" as they surrounded them; she saw someone in the group reach for their waistband; and that she thought Bolanos fired "out of protection" and "ha[d her] back." Gang experts on both sides, Bolanos asserts, opined that exclaiming gang affiliations would be perceived as a threat and followed by violence. Bolanos also points to Landin's statement that the shooter fired when they leaned into the window, and did not appear to aim the gun, as evidence he fired defensively.

The trial court properly declined to instruct on self-defense. When viewed "in these circumstances," the evidence cited by Bolanos proves, at most, a verbal altercation occurred between the victims and the car's occupants. Sanchez testified about a prior incident at the parking structure involving members of the Ventura Avenue gang. She and Bolanos decided to drive to the fifth floor anyway. She pulled up closely to the white sedan, around which five to six men were gathered. The Mustang's driver's side window was already rolled down. They remained in the car. Sanchez admitted being the first to ask something to the effect of "what's up?" and engaged willingly with Alex. She initially told police that one of the men reached for his waist but

10

testified at trial that she did not remember saying this. Nor is there evidence to support that Bolanos saw or was even aware of this alleged movement. Other than this isolated statement, nothing in the record indicates Sanchez feared imminent bodily injury; the trial court did not err when it declined to infer from this testimony that *Bolanos* feared imminent bodily injury from his position in the passenger seat. (See *People v. Sakarias* (2000) 22 Cal.4th 596, 620 [speculation insufficient to warrant lesser included offense instruction].)

*Exclusion of Evidence Relevant to Self-Defense*
*as to Bolanos*

Bolanos contends the trial court abused its discretion by excluding evidence relevant to his claim of self-defense. This includes: (1) Alex's blood toxicology results; (2) testimony about Alex's confrontation with a purported gang member earlier that night; and (3) a photo of Alex making hand signs for the Ventura Avenue gang. We review the exclusion of evidence for abuse of discretion. (*People v. Montes* (2014) 58 Cal.4th 809, 869.)

The toxicology results from a blood sample taken by the medical examiner showed Alex had a blood alcohol level of .075 percent. The sample also tested positive for THC. Defense counsel sought to admit the results to corroborate Sanchez's testimony that Alex behaved aggressively. The trial court correctly excluded the results as irrelevant to self-defense. Self-defense hinged on Bolanos's state of mind—not his victim's. Neither Sanchez nor any other witness at trial described Alex as behaving drunkenly or high when he approached the Mustang. And while post-mortem blood toxicity may help explain *why* he might have acted aggressively during the confrontation, it would not show he *did* act aggressively. Only evidence of the latter

11

would have "any tendency in reason to prove" Alex posed an imminent risk of bodily injury to Bolanos under these circumstances. (Evid. Code, § 210.) The trial court exercised its discretion properly when it declined to admit the results solely to prove Alex's propensity for aggression. (*Id.*, § 1103, subd. (a) ["evidence of the character or a trait of character (in the form of . . . evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is: (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character"].)

Bolanos sought to examine Manny about a prior gang-related incident involving Alex. The court held an Evidence Code section 402 hearing to determine admissibility. Manny testified that an unidentified man approached them at the San Souci Bar about 60 to 90 minutes before the shooting. He said "SurTown" to Alex. Alex "squar[ed] up" with him and responded, "You tripping or something?" Manny stepped between them and told the man "we just got out of work and we are trying to have a couple of drinks." Alex and the man then shook hands then separated. Manny and Alex did not see him again. The trial court excluded the evidence, stating: "I think under the [Evidence Code section] 352 analysis it does not survive. Its probative value is extremely limited and the amount of time that it would take and the risk of confusing the jury is too substantial." We agree. Manny described the man who confronted Alex as drunk and aggressive. He described his brother as "kind of" agitated because the way the man approached him. The incident then quickly escalated and had no connection with the shooting in the parking structure. If

12

believed, this account would prove Alex's restraint as much as his aggression.

Lastly, Bolanos contends an undated photo retrieved from the internet of Alex making Ventura Avenue gang signs was relevant to corroborate Sanchez's testimony that he made gang signs before the shooting. Defense counsel requested the court recall two witnesses: (1) Manny, "to lay the foundation for when [the photo] was either created or taken or when it was broadcast through social media"; and (2) Detective Anthony Morales, who could confirm whether the hand signs represented the Ventura Avenue gang. Excluding the photo was again within the court's discretion. It showed, at most, Alex's affinity or affiliation with the gang at a different time and location. A trial court may exclude evidence that is cumulative, that would confuse the jury or consume undue time, or that is more prejudicial than probative. (Evid. Code, § 352; *People v. Gutierrez* (2009) 45 Cal.4th 789, 828.) Even if relevant, such evidence was already in large supply. Sanchez testified about how she recognized Alex's hand signs and heard him claim Ventura Avenue as he approached her. The detective who questioned Sanchez after the shooting confirmed her account—specifically, that Alex alone appeared gang-affiliated and flashed signs, while the others appeared "skater-ish." Defense counsel for both appellants cross-examined the People's gang expert at length about the significance of announcing one's gang and flashing hand signs. Each provided a hypothetical scenario in which an individual who announced "Ventura Avenue" and flashed that gang's hand signs. The court also admitted a photograph of an impromptu shrine built at the parking structure adorned with gang paraphernalia.

*Sufficiency of Gang Enhancement Evidence*
*as to Bolanos*

Bolanos contends the record contains insufficient evidence that Crazy Boys gang members "collectively engage[d]" in a pattern of criminal activity under the gang enhancement statute. (§ 186.22, subd. (f).)  Bolanos's defense counsel appears to have conceded this element during closing argument.  We will nevertheless consider his contention in light of our Supreme Court's analysis of collective engagement in *People v. Clark* (2024) 15 Cal.5th 743 (*Clark*), which post-dated trial in this case. Doing so, we conclude substantial evidence supports the jury's "true" finding on the enhancement.

Section 186.22, subdivision (b)(1) provides a sentence enhancement for "a person who is convicted of a felony committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the person has been convicted . . . ."  A criminal street gang is defined as "an ongoing, organized association or group of three or more persons, whether formal or informal, having as one of its *primary activities* the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members *collectively engage in, or have engaged in, a pattern of criminal gang activity*." (§ 186.22, subd. (f), italics added.)  Establishing a pattern of criminal gang activity requires proof of two or more enumerated predicate offenses.  (*Id.*, subd. (e).)

14

*Clark* concluded "[t]he Legislature's reference to collective engagement . . . calls for an inquiry not just into how the predicate offenses benefited the gang, but also how the gang works together *as a gang*. It calls for a showing of a connection, or nexus, between an offense committed by one or more gang members and the organization as a whole." (*Clark*, *supra*, 15 Cal.5th at p. 762.) "This organizational nexus may be shown by evidence linking the predicate offenses to the gang's organizational structure, meaning its manner of governance; its primary activities; or its common goals and principles. By reference to these elements of a gang's affairs and operations, we do not mean to overstate the degree of formality required. As we have recognized, some gangs have a "'loose'" structure [citation], while others are 'highly ordered and disciplined,' with a 'well-defined' hierarchy [citation]." (*Ibid*.)

Prosecutors identified two predicate offenses here, both from 2019: (1) the stabbing of a rival Santa Paula gang member by Crazy Boyz members; and (2) the conviction of three Crazy Boyz members for possession of firearms. Bolanos argues there was insufficient evidence to prove the firearms convictions were gang-related under *Clark*. We disagree. These convictions resulted from the simultaneous execution of three search warrants on gang members' homes in Oxnard and Santa Paula. The participating officers testified about the firearms and gang paraphernalia found at each home. A detective familiar with the Crazy Boyz testified the gang's primary activities at the time were assault and possession of firearms and weapons. He described how the gang, like many other street gangs, horded and shared firearms so they were "at the ready to use against rivals." This established the required evidentiary nexus between the

15

predicate offenses and the primary activities of the Crazy Boyz. (See *Clark*, *supra*, 15 Cal.5th at p. 762 ["collective engagement might be shown by demonstrating that the offenses are reflective of the primary activities of the gang, or else adhere to a common goal or plan characteristic of the gang in question"].)

*Nunez's Upper Term for Assault with a*
*Semiautomatic Firearm*

Nunez first contends the trial court erred by imposing the upper term for assault with a semiautomatic firearm under section 245, subd. (a). He raised none of his objections at sentencing. They are forfeited. (*People v. Scott* (1994) 9 Cal.4th 331, 353; *People v. Achane* (2023) 92 Cal.App.5th 1037, 1043; *In re Beal* (1975) 46 Cal.App.3d 94, 100.) We would affirm the trial court on the merits as well.

Former section 1170, subdivision (b) gave trial courts discretion to decide which of the three terms specified for an offense would best serve the interests of justice. Senate Bill No. 567 (2021-2022 Reg. Sess.) amended the statute to require imposing the middle term as the presumptive sentence effective January 1, 2022. (§ 1170, subd. (b)(1)-(2); Stats. 2021, ch. 731, § 1.3.) A court may now impose the upper term only if "there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).) The court has broad discretion in its sentencing determination if there is a sufficient factual basis to support aggravating or mitigating factors. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847, superseded by statute as stated in

16

*People v. Lynch* (2024) 16 Cal.5th 730, 757.)  We review the sentencing decision for abuse of discretion.  (*Ibid.*)

The jury found two aggravating circumstances true when it convicted Nunez of assault with a semiautomatic firearm:  (1) he was armed with and used a weapon (Cal. Rules of Court, rule 4.421(a)(2)); and (2) he "engaged in violent conduct, [which] indicates a serious danger to society" (*id.*, rule 4.421(b)(1)).  It found not true that the crime involved great violence, great bodily injury, threat of great bodily harm *(id.*, rule 4.421(a)(1)).  Prior to the bifurcated stage of trial, Nuez admitted four more aggravating factors:  (1) his prior convictions or sustained juvenile petitions are numerous or of increasing seriousness (*id.*, rule 4.421(b)(2)); (2) he served a prior jail or prison term (*id.*, rule 4.421(b)(3)); (3) he was on probation, mandatory supervision, post-release community supervision, or parole when the crime was committed (*id.*, rule 4.421(b)(4)); and (4) his prior performance on probation, mandatory supervision, post-release community supervision, or parole was unsatisfactory (*id.*, rule 4.421(b)(5)).  The trial court did not discuss any individual factor when it selected the upper term, stating only that "the factors in aggravation clearly outweigh any factors in mitigation."

Nunez argues the jury's "true" finding on the rule 4.421(a)(2) factor, i.e., that he was armed with and used a weapon, is an element of the offense of assault with a semiautomatic firearm and cannot be used in impose the upper term.  We agree and will presume the trial court was "aware of and followed the applicable law" by not relying on this factor. (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496; see CALCRIM no. 875 ["To prove that the defendant is guilty of this crime, the

People must prove that:  [¶]  1. The defendant did an act with a semiautomatic pistol . . ."].)

Similarly, Nunez argues the jury's true finding on the rule 4.421(b)(1) factor, i.e, that he "engaged in violent conduct which indicates [a] serious danger to society," is akin to an element of his assault charge because it is "inherent in the commission of the offense . . ."  Here we disagree.  Convicting Nunez required jurors to find, among other things, that he "act[ed] with a semiautomatic pistol that by its nature would directly and probably result in the application of force to a person."  (See § 240 ["An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another"].)  Violent conduct or force "indicat[ing] a serious danger to society" is not an element of this crime.

Nunez next argues that three of the four aggravating factors to which he stipulated—i.e., that he served a prior jail or prison term, that he was on probation or parole when the crime was committed, and that his prior performance on probation or parole was unsatisfactory—"are overlapping" or "three sides of the same coin."  We again disagree.  "Parole status and performance on parole are distinct aggravating factors.  Each is distinct from the aggravating factors of having numerous prior convictions and having served prior prison terms."  (*People v. Yim* (2007) 152 Cal.App.4th 366, 369.)

Lastly, Nunez contends the court erroneously imposed the upper term because it believed Nunez was the "but for" cause of the shootings.  He directs us to these remarks by the court at sentencing:  "[W]hen I look at this case – and although I believe as far as is the murder goes, Mr. Bolanos was fully responsible for the murder – I agree with the victim impact statements today

18

that it doesn't happen at all if Mr. Nunez doesn't show up and bring the guns. I mean, that's the reality. Mr. Bolanos wouldn't have shot anybody that night if he couldn't have and I don't understand why that happened. I have done lots of murder cases in this county. Lots. This is not the first time I have had a murder that was gang related. This is not even the first time that I have had a murder case where a brother died in the arms of his brother after being killed. And it's just this repetitive thing that goes over and over and over and I get so tired of my heart pouring out to victims."

Nunez argues the trial court's remarks show it disregarded his acquittal on count 7 (i.e., shooting from a vehicle). We are not persuaded, however, that the court engaged in improper fact finding or abused its discretion when it selected the upper term on count 4. The court commented positively about Nunez's courtroom demeanor immediately after making these remarks and expressed sympathy for his situation. It then concluded as follows: "As to Count 4, the Court is going to impose the upper term of 18 years. I chose the upper term *because the factors in aggravation clearly outweigh any factors in mitigation*." (Italics added.) As discussed above, the aggravating factors found true by the jury (and those stipulated by Nunez) amply support the court's selection.

### Victim Restitution

Lastly, Nunez contends the trial court erred when it ordered him to pay victim restitution to Jaquelin Ortiz and Joel Landin. He argues the jury's "not guilty" verdict on count 7 (shooting from a motor vehicle) established that Bolanos alone is responsible for the victim's economic losses. We disagree.

19

Penal Code section 1202.4 requires restitution to "a victim [who] has suffered economic loss as a result of the defendant's conduct." (§ 1202.4, subd. (f).) "Just as in tort law . . . the law must impose limitations on liability for victim restitution other than simple direct causality or else a defendant will face *infinite liability* for [their] criminal acts, *no matter how remote* the consequence." (*People v. Jones* (2010) 187 Cal.App.4th 418, 425, italics added.) The defendant's crimes, it follows, must be a proximate cause of the victim's economic losses. (*People v. Foalima* (2015) 239 Cal.App.4th 1376, 1396.) "California courts have adopted the 'substantial factor' test for analyzing proximate cause." (*Ibid.*)

Nunez misconstrues the trial court's order. It did not find him liable for all losses resulting from the shooting. It ordered him to pay restitution in "amounts to be . . . determined" at a future hearing. Nunez does not dispute Ortiz or Landin are victims of his separate conviction for assault. (See § 1202.4, subd. (k)(3) ["'victim'" includes a "person who has sustained economic loss as the result of a crime" and who is a designated relative or household member of the victim].) The operative charging document alleged Nunez "did willfully and unlawfully commit an assault upon [Alex] Hernandez, [Manny] Hernandez and Joel Landin with a semiautomatic firearm." The jury found him guilty of this charge and found true special allegations that he personally used a firearm and "engaged in violent conduct, which indicates a serious danger to society . . . ." We see no reason the court cannot order him to pay restitution for this crime. Nunez may object if he believes a future award is excessive. (§ 1202.4, subd. (f)(1) ["The defendant has the right to

20

a hearing before a judge to dispute the determination of the amount of restitution"].)

DISPOSITION

The judgment is affirmed.
NOT TO BE PUBLISHED.

CODY, J.

We concur:

YEGAN, Acting P. J.

BALTODANO, J.

Ryan J. Wright, Judge
Superior Court County of Ventura

_____

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant Julian Anthony Nunez.

Adrian Dresel-Velasquez, under appointment by the Court of Appeal, for Defendant and Appellant Raymond Max Bolanos.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General, and Susan S. Kim, Deputy Attorney General, for Plaintiff and Respondent.